*289 OPINION OF THE COURT
Fuchsberg, J.
After 3:00 p.m. one sunny afternoon in May, then four-year-old Malikah Ferrer, in the company of her eight-year-old sister, was crossing a Bronx street from between two parked cars when she was struck by an automobile owned by the defendants Ben and Anna Harris and operated by the former. At the time, the girls were headed directly for the defendant Hassan Javidan’s brightly colored “Mister Softee” motor van, which from a double-parked position was tunefully drawing attention to its wares of frozen custard and ice cream.
The Harrises and Javidan now appeal separately from an order of the Appellate Division affirming a judgment entered on a jury verdict against both of them on young Malikah’s behalf in the sum of $200,000 with the respective liabilities apportioned under Dole v Dow Chem. Co. (30 NY2d 143) at 75% against the Harrises and 25% against Javidan.[1],[2] In the main, the questions these appellants now raise are whether a prima facie case was made out against each of them and whether, as to the Harrises, the trial court erred in refusing to instruct the jury on the effect of an emergency on the reasonableness of Ben Harris’ conduct. In addition, it is asserted that all the defendants were prejudiced by the admission of testimony that Malikah’s mother repeatedly would enjoin both her daughters “to look both ways and cross at the green and cross at the corner” and instilled in Malikah the idea that she was “never to cross by herself unless someone was with her”. For the reasons which follow, while we believe there was enough shown on which to send the case to the jury against *290 all the defendants, since, in our view, the Harris defendants were entitled to a charge on the emergency doctrine, as to these defendants it is appropriate that there be a new trial. Should the Harrises be held liable again, the apportionment issue will also have to be determined de novo.
Turning first to the sufficiency of the proof, in the present posture of the case the facts, of course, must be taken most favorably to the successful plaintiff (Caprara v Chrysler Corp., 52 NY2d 114, 118). To that end, we first note that Walton Avenue, the scene of the occurrence, is a relatively narrow southbound one-way street, which, after allowing for parked vehicles along each curb, according to police and photographic proof would permit the traffic to flow either comfortably in one traveling lane or crowdedly in two. Between East 164th and East 161st Streets, Walton Avenue is unbroken by any intersecting street. Its east side is bordered by a public park and its west side by apartment houses, in one of which the Ferrer family lived. When the events which are our concern occurred, the “Mister Softee” truck had double-parked abreast of vehicles standing next to the west curb of Walton Avenue at a point some 300 feet south of 164th Street.
It was in this setting that Malikah and her sister, who had been at play in the park in the presence of their mother, began to cross toward the truck. For its part, for the southbound Harris vehicle to pass the point where the ice cream truck was obstructing the westernmost traveling lane, it, of necessity, could confinedly proceed only via the easterly traveling lane, in the process passing close to the row of parked cars on its right. It was these two lanes, the easternmost parking one and the easternmost traveling one, which children coming east to west from the park would have to traverse to reach the truck.
The record reveals ample evidence that Ben Harris knew the area, having worked nearby for years, and, as a result, was familiar with the fact that the combination of the park and apartment buildings meant that children could be expected to be about on a fine May day. More so, as he was to testify, on this very occasion, though he did not remem *291 ber the ice cream van, he admitted noticing children on the sidewalk and at play when he was still in the area of the last intersection, that at East 164th Street. Indeed, though the maximum legal speed limit was 30 miles per hour, consistent with the caution the presence of children engendered, he claimed that, as' he came along, he was proceeding at 15 to 20 miles per hour. He also testified that he saw Malikah step off the sidewalk and run between the parked cars, in response to which he stopped his car within 4 feet, when, as he described it, the child ran into his door. It is basically on this version that the Harrises premise their contentions that their motion to dismiss and, when that failed, their request for a charge on emergency, each in turn should have been granted.
But the plaintiffs’ side of the case, though unable to produce any disinterested eyewitness to the operation of the Harris vehicle as it bore down on the point of collision, did not rest on the Harris story. First, they established that, though the driver saw the child as she was just stepping off the curb, he never blew his horn to alert her to his approach. Second, they called a witness, Carolyn Ford, who, while she had not observed the Harris car at an earlier point, was able to describe the impact as one at the front of the car, a version borne out both by an impression of a tire tread found on the child’s sneaker and medical proof that the injuries were not scientifically reconcilable with the kind of impact that Harris claimed had taken place. Moreover, the plaintiffs lay stress on the fact that, while the speed limit is 30 miles per hour, even a lesser speed is required when it is “reasonable and prudent under the condition and having regard to the actual potential hazards then existing” (New York City Traffic Regulations, § 60, subd [c]); in this case, given conceded awareness of the propinquity and proclivity of the children (see Prosser, Torts [4th ed], p 170; see, generally, Darting in Front of Automobile, Ann., 113 ALR 528) and the effect of the double-parked ice cream truck on the Harris driver’s maneuverability, plaintiffs argued that even 15 to 20 miles per hour was unreasonable.[3]
*292 Obviously, the determination of what was appropriate calls for the application of the proverbial and somewhat flexible reasonable man standard, one which a cross-section of lay persons may be thought to be especially qualified to gauge (see Conway v O’Brien, 111 F2d 611, 612 [Learned Hand, J.]). Perhaps it is the predominance of considerations of this character which in motor vehicle cases have allowed for more latitude in determining the appropriateness of their submission to a jury (see Pfaffenbach v White Plains Express Corp., 17 NY2d 132, 136 [“Modern experience suggests we can be less certain of the precision of our categories in this field of adjudication than we had confidently assumed a generation or so ago”]).
Nevertheless, while we therefore hold, as did the Appellate Division, that whether Ben Harris was negligent was a question of fact, it is more than conceivable that a jury could conclude that this defendant was faced with an emergency. For instance, it would be rational for the jury to have adopted a view of the evidence from which it concluded that traveling at 15 to 20 miles per hour was an adequate response to the prevailing circumstances and that the opportunity to learn of and react to the presence of Malikah was too brief and too unexpected to allow time to think of blowing the horn or to make a calculated and intelligent choice as to the best way to avoid or minimize the impending collision, be it by braking, acceleration or otherwise. Against such contingency, it was entitled to judicial guidance on the applicable law.
For, it is common sense and good law that, when one is confronted with a sudden and unexpected event or combination of events which leave little or no time for reflection or deliberate judgment, this itself may be a significant circumstance which, realistically as well as conceptually, should enter into the determination of the reasonableness of the choice of action pursued (see Rossman v La Grega, 28 NY2d 300; Wagner v International Ry. Co., 232 NY 176; *293 Restatement, Torts 2d, § 296, subd [l]).[4] This is not to say that an emergency automatically absolves one from liability for his conduct. The standard then still remains that of a reasonable man under the given circumstances, except that the circumstances have changed. Accordingly, the actor “may still be found to be negligent if, notwithstanding the emergency, the acts are found to be unreasonable” (Prosser, Torts [4th ed], p 169). Nor does the fact that the emergency action was reasonable insulate an actor from liability for prior tortious conduct that brought on the emergency (see 2 Harper and James, Torts, § 16.11, p 939).
We now come to the prima facie case against defendant Javidan. The two elements with which we are concerned on his phase of the case are negligence and proximate cause. The first of these presents no problem since the evidence that this appellant had violated section 81 (subd [c], par 2) of New York City’s Traffic Regulations, which interdicted the double-parking of the “Mister Softee” van (Somersall v New York Tel. Co., 52 NY2d 157, 166), was some evidence of negligence (see Long v Forest-Fehlhaber, 55 NY2d 154, 160).
The perception of proximate cause is hardly more difficult. Unlike Sheehan v City of New York (40 NY2d 496), on which this appellant largely relies, the vehicle had no right to be where it was at the time of the accident {id., p 502). It also takes no stretch of the imagination to appreciate that, but for the van’s unlawful double-parking, the Harris car would not have had to travel as close to the automobiles parked on the east side of the street, thus affording its operator an opportunity for a more wide-angled, more distant and earlier view of the child. More directly, absent the van, the westerly traveling lane would have been an unblocked avenue into which Harris might have maneuvered to avoid the accident. In short, to say the least, the connection between the disobedience of the traf *294 fic regulation and the happening of the accident was logical and immediate enough to have permitted the jury to find that Javidan’s negligence was a substantial proximate cause of the event which.produced the injury (Restatement, Torts 2d, § 431). This also makes it unnecessary for us to reach or consider respondent’s “blocked vision” (cf. Naeris v New York Tel. Co., 5 NY2d 1009, affg 6 AD2d 196) or “defective egress” (cf. Bishop v Hamad, 43 AD2d 805) contentions on proximate cause, all the more so since the Trial Judge did not send the case to the jury on either of these theories.
Finally, since there is to be a new trial as to the Harrises’ liability and, as hereináfter indicated, possibly on the apportionment of liability, we comment briefly on the evidentiary point arising out of the admission of testimony as to the safety practices the mother had instructed her young daughters to follow on crossing a street. Though less than fully preserved, appellants’ assignment of error on this account for the most part is grounded on older cases which hold either that it is “not competent for a plaintiff to give evidence that the person by whom the alleged negligent act was committed had previously committed [others]” (Wooster v Broadway & Seventh Ave. R.R. Co., 72 Hun 197, 198) or that the potential for distraction to which such “collateral issues” would lead militate against their introduction (see Zucker v Whitridge, 205 NY 50, 65-66).
In recent years, however, we have indicated support for less dogmatic adherence to the policy so enunciated, most particularly where it is established in limine that there are a sufficient number of instances of the repetitive conduct to give reasonable assurance that these will prove a persistent habit or regular usage by one in control of the circumstances in which it is employed (Halloran v Virginia Chems., 41 NY2d 386, 392-393). Here no such showing was made or attempted. To the contrary, plaintiff, abjuring any intention to prove “prior similar conduct”, asserts a desire to explore the “knowledge and experience of the infant”. Further, since the quality of the parental supervision was not imputable to the child (see General Obligations Law, § 3-111) and the statements the mother made were not proof that the child had acted on them, at a new trial objection to their admission should be sustained.
*295 For all these reasons, we now conclude that the order of the Appellate Division should be modified, with costs to defendants Harris against plaintiff and costs to the plaintiff against defendant Javidan, to effect the following determinations:
1. Ferrer’s judgment against Javidan should be affirmed.
2. The judgment of Ferrer against Ben and Anna Harris should be reversed on the issue of their liability and the case against them remitted to Supreme Court, New York County, for a new trial on that issue alone.
3. Treating the recital in the judgment of Supreme Court as to apportionment between defendants Javidan and Harris as though it were a direction, in the event the Harris defendants are found liable again after a new trial, and only then, the determination on which the direction for apportionment is based, predicated as it was in part-pn the verdict against Harris reached without consideration of the proof of emergency, should also be vacated and a new trial granted as to both Javidan and Harris on the issue of the apportionment of the $200,000 damage verdict.
4. There should be no new trial on the amount of Ferrer’s damages.
5. Once the defendant Javidan has fully satisfied the judgment, the new trial may proceed on Javidan’s initiative under his article 14 claim for contribution against the Harris defendants alone.
Chief Judge Cooke and Judges Jasen, Gabrielli, Jones, Wachtler and Meyer concur.
Order modified, with costs to defendants Harris against plaintiff and costs to plaintiff against defendant Javidan, and case remitted to Supreme Court, New York County, for a new trial in accordance with the opinion herein and, as so modified, affirmed.

. While Jose Ferrer, Malikah’s father and natural guardian, originally had joined a personal cause of action for medical expenses and loss of services, the jury did not report a verdict on his action. Thereafter, on his motion, in which he recited that he had received reimbursement for his medical expenses under no-fault, the judgment was “corrected” to record a verdict against him in his personal capacity. Concordantly, he took no appeal to the Appellate Division.

. The Harris appeal is here as a matter of right, Justice J. Robert Lynch having dissented as to these defendants essentially on the ground that it was reversible legal error not to have given the requested emergency charge (CPLR 5601, subd [a], par [i]). Though the Appellate Division unanimously affirmed without opinion as to Javidan, his appeal is here by leave of that court (CPLR 5602, subd [a], par 1, cl [i]).

. According to figures based on tests performed by the US Bureau of Public Roads, *292 under normal road conditions a motor vehicle proceeding at 20 miles per hour travels 30 feet per second. The minimum stopping distance of a vehicle traveling at that speed is 44 feet, including 22 feet covered during reaction time and 22 feet after the brakes are fully applied (How to Drive, published by the American Automobile Association [1978], p 78).

. As Judge Cardozo put it in a somewhat different context, “ ‘Errors of Judgment’, however, would not count against him, if they resulted ‘from the excitement and confusion of the moment’ (Corbin v. Philadelphia, 195 Penn. St. 461, 472). The reason that was exacted of him was not the reason of the morrow. It was reason fitted and proportioned to the time and the event” (Wagner v International Ry. Co., supra, at p 182).