THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MARK L. FUTTERMAN, Appellant.

Fourth Department, April 12, 1982

APPEARANCES OF COUNSEL

*Richard D. O'Connor* (*Joseph Mistrett* of counsel), for appellant.

*Richard J. Arcara, District Attorney* (*William Knapp* of counsel), for respondent.

OPINION OF THE COURT

DENMAN, J.

Defendant challenges his conviction for criminally negligent homicide on the ground that the evidence was insufficient to support the verdict. The charge arose from the death of David Murphy, a patient in the psychiatric unit of Erie County Medical Center where defendant was the head nurse on the night shift.

The testimony at trial established the following series of events. Murphy was harassing an elderly female patient by touching her and pushing her wheelchair up and down the hall. He was very agitated, pacing, and talking loudly. There was a standing order for restraint and seclusion for Murphy. Defendant decided to medicate the patient and

place him in seclusion and sent for other staff members to assist him. As defendant started walking toward Murphy with a syringe to administer the medication, Murphy lunged at defendant and a general struggle ensued in which four male staff members including defendant attempted to subdue the patient. They were able to get him on the floor where he continued to struggle violently. Defendant was lying across the upper part of the patient's body with his arm around the patient's neck, the upper part of his arm on one side of Murphy's neck with his forearm and elbow bent, so that his forearm was across the patient's throat. When one of the other staff members advised defendant that he was choking the patient, defendant released the pressure somewhat but kept his arm in the same position. The struggle continued for a few minutes during which the patient was screaming that they worked for Satan and that he was praying to God for strength to beat them. Eventually, a fifth staff member succeeded in giving Murphy a shot in the hip. When Murphy seemed to calm down, Futterman suggested that they try to take him to his room. When they attempted to lift him, Murphy began to swing his arms and kick and threw all four men against the wall. They succeeded in forcing him face down on the floor once more by grabbing his extremities. Defendant again placed his arm around the patient's neck and, when cautioned that the patient's face was flushed, released the pressure somewhat but did not remove his arm from that position. Murphy continued to struggle violently but then subsided. One of the other members of the staff told defendant to check Murphy's breathing and it was determined that he was all right. A few minutes passed while the staff awaited the arrival of security guards. The patient was lying on the floor breathing heavily but not moving. When the security guards arrived, they and the staff members lifted Murphy and carried him to his room. When they placed him on the bed and turned him over, they realized that he was not breathing. External cardiac massage and advance life support techniques were utilized, but the patient did not respond.

There was testimony that Murphy was tremendously strong and extremely violent. Although it was established

that the proper method of restraining a patient is to grab his extremities, there was testimony that if the patient could not be controlled in that manner, the staff would have to use whatever means were available to bring the situation under control. Further, although one of the staff testified that he was concerned about the fact that defendant had the patient in a neckhold, all of the staff members testified that they did not believe that there was any danger that the patient would be asphyxiated. Viewing the testimony in the light most favorable to the People (*People v Benzinger,* 36 NY2d 29, 32), we conclude that David Murphy died as the result of pressure from a choke hold applied by the defendant during the second struggle which lasted for approximately 8 to 10 minutes. Medical opinion established that oxygen deprivation for a period of 4 to 5 minutes would be fatal.

The indictment returned against defendant charged him with two crimes: manslaughter in the second degree (Penal Law, § 125.15, subd 1 [reckless manslaughter]) and criminally negligent homicide (Penal Law, § 125.10). At the close of the proof the trial court dismissed the manslaughter count and the jury found defendant guilty on the single count of criminally negligent homicide. Criminally negligent homicide is defined as follows:

"A person is guilty of criminally negligent homicide when, with criminal negligence, he causes the death of another person." (Penal Law, § 125.10.)

"A person acts with criminal negligence with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation." (Penal Law, § 15.05, subd 4.)

Criminal negligence has been a constant source of confusion and vexation for the courts and the Legislature. Conceptually it presents a difficult problem because of its apparent internal inconsistency. The type of conduct which

we characterize as "criminal" and to which the penal statutes are directed generally requires the element of *mens rea* or a criminal state of mind. In contrast to the type of awareness usually employed to define criminal action, viz., "intentional" or "knowing", the culpable mental state required for criminal negligence is a state of unawareness, a failure to perceive a risk, which concept, of course, is intrinsic to the law of tort liability (see Comment, Is Criminal Negligence a Defensible Basis for Penal Liability?, 16 Buffalo L Rev 749; Hall, Negligent Behavior Should Be Excluded From Penal Liability, 63 Col L Rev 632). Instead of evaluating conduct which is easily recognizable and condemned as morally reprehensible, we are forced to scrutinize conduct which consists essentially of an error in judgment. Therein lies the difficulty for it should be troublesome to even the most casual observer that an error in judgment, though perhaps properly resulting in civil liability, is punishable by criminal sanctions. What is there then to distinguish between the kind of judgmental failure common in civil law and that kind of negligence which makes a qualitative leap into the area of criminal law?

Prior to enactment of the present Penal Law commentators and revision commissions had long pondered the problems inherent in criminal negligence statutes. Not only was there a lack of differentiation between civil and criminal negligence but there was substantial confusion and ambiguity in the statutes dealing with recklessness and negligence. For example, the former Penal Law contained certain manslaughter provisions based on negligent conduct,* but the statutory language and judicial interpretation was generally in terms of "wanton", "wanton and willful", "gross negligence," (see, e.g., *People v Angelo,* 246 NY 451), in short, the language of recklessness.

In the revised Penal Law, the Legislature attempted to clarify and delineate this area of the law (see *People v*

---

* Subdivision 3 of section 1052 made negligent conduct criminal in specific circumstances: i.e., woman producing miscarriage; negligent use of machinery; mischievous animals; overloading passenger vessel; persons in charge of steamboats; persons in charge of steam engines; acts of physicians while intoxicated; persons making or keeping gunpowder contrary to law.

*Haney,* 30 NY2d 328, 331-333; Hechtman, Practice Commentaries, McKinney's Cons Laws of NY, Book 39, Penal Law, § 15.05, pp 29-31; § 125.10, pp 378-379). The definitional section of the revised Penal Law (§ 15.05) provides a clear demarcation between recklessness and criminal negligence. Reckless conduct is that in which the actor is aware of the risk and proceeds in disregard thereof whereas criminally negligent conduct is that in which the actor fails to perceive a substantial risk (see *People v Warner-Lambert Co.,* 51 NY2d 295, 302-303, cert den 450 US 1031; *People v Fitzgerald,* 45 NY2d 574, 579; *People v Haney, supra*).

Although the Penal Law revisions have in large measure clarified the difference between reckless conduct and criminally negligent conduct, the line separating civil from criminal negligence is still somewhat blurred. The factors which impose the greater degree of culpability on a criminally negligent defendant are that the risk which he fails to perceive is so substantial that his failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would exercise in those circumstances (*People v Haney, supra,* p 333; *People v Fitzgerald, supra,* p 579).

Measuring Mark Futterman's conduct against that background, we do not find that his failure to perceive the risk of death to David Murphy was such gross deviation from the standard of care to be expected from a reasonable person under those circumstances as to constitute criminal liability. All of the testimony bore out that David Murphy was an extremely violent patient of unusual strength. One witness testified that if defendant had not acted very forcefully, the staff would not have been able to bring the patient under control. All of the staff members who witnessed the event testified that they never perceived that the patient could not breathe or was in danger of asphyxiation. This was an emergency situation, fraught with danger, in which defendant was required quickly to assess the situation and pursue a course of action which he deemed advisable. Since there was no time for the weighing of alternatives, he cannot reasonably be held to the same standard as one who has had full opportunity to reflect

(*Amaro v City of New York,* 40 NY2d 30, 36). "[W]hen one is confronted with a sudden and unexpected event or combination of events which leave little or no time for reflection or deliberate judgment, this itself may be a significant circumstance which, realistically as well as conceptually, should enter into the determination of the reasonableness of the choice of action pursued (see *Rossman v LaGrega,* 28 NY2d 300; *Wagner v International Ry. Co.,* 232 NY 176; Restatement, Torts 2d, § 296, subd [1])." (*Ferrer v Harris,* 55 NY2d 285, 292-293.) To stigmatize the defendant with the brand of a criminal for an incident, which though tragic, was the result of an error in judgment, would be wholly inappropriate, inconsistent with the purpose of the criminal law, and totally disproportionate to defendant's inadvertent conduct. We therefore reverse the judgment of conviction and dismiss the indictment.

SIMONS, J. P. (dissenting). A jury has found that defendant, an experienced nurse, caused the death of a patient, David Murphy, "with criminal negligence" (see Penal Law, § 125.10). That verdict is necessarily grounded upon the jurors' finding that when defendant choked Murphy to subdue him, he "fail[ed] to perceive a substantial and unjustifiable risk" of death (see Penal Law, § 15.05, subd 4). The evidence in the record supports that determination.

First, the People submitted medical evidence that death may be caused by strangulation and that Murphy died from asphyxia due to strangulation. Next, they proved that defendant choked Murphy. Indeed, several witnesses testified not only that defendant was on top of Murphy, pulling his head up off the floor and choking him with his arm for a period of 8 to 10 minutes (4 to 5 minutes will cause death), but that defendant continued to apply pressure to Murphy's neck even after the patient was under control. There was also evidence that choke-holds were not an acceptable method of restraining a violent patient and that the approved procedure is to overpower the patient with a sufficient number of staff attendants. Thus, the People proved that defendant's conduct presented a substantial and unjustifiable risk.

The People then proved that defendant failed to perceive the risk of his conduct. One witness testified that on two

occasions, after he told defendant that he was choking the patient, defendant answered, "I know it". The witness advised defendant to let go of Murphy's neck, but defendant nevertheless continued to apply pressure, albeit lessened pressure. Another witness testified that during the incident defendant was offered restraints to be placed on Murphy and defendant answered that he didn't need them, "he had the patient choked out enough."

The jurors, after hearing this evidence, found defendant guilty of failing to perceive a substantial and unjustifiable risk and they determined, as a question of fact, that defendant's failure to perceive that risk constituted a gross deviation from the standard of care that a reasonable person would observe under all the circumstances (Penal Law, § 15.05, subd 4). Their verdict was supported by the evidence and the judgment should be affirmed.

HANCOCK, JR., DOERR and SCHNEPP, JJ., concur with DENMAN, J.; SIMONS, J. P., dissents and votes to affirm in an opinion.

Judgment reversed, on the law and facts, and indictment dismissed.