■ THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v JUNIOR SIMON, Respondent.—Order, Supreme Court, New York County (Carol Arber, J.), entered January 29, 1987, which, after a jury verdict finding defendant guilty of manslaughter in the second degree and criminally negligent homicide, dismissed the indictment pursuant to CPL 290.10 on the ground of legal insufficiency of the trial evidence, reversed, on the law, the verdict reinstated, and the matter remanded to the trial court for sentencing.

At the time of this incident, defendant was a licensed practical nurse, working at a psychiatric ward at Metropolitan Hospital. The victim, Mary O'Brien, was a psychiatric patient in that ward. Ms. O'Brien had a history of mental instability and drug abuse. She was also suffering from chronic respiratory difficulty, having undergone a tracheotomy, the wound from which had not completely healed.

The trial testimony of two of the other patients and of

hospital staff then present reveals the following. On March 7, 1985, at approximately 5:00 P.M., Ms. O'Brien became agitated and struck Miriam Fabello, the head nurse on duty at that time, knocking her to the floor. A nurse's aide, Velma Burrows, intervened and separated them. Two nursing supervisors and three security guards were summoned to the ward, as was the psychiatric resident physician, Dr. Paul Agnelli. Dr. Agnelli examined O'Brien and found her "extremely anxious" and "very agitated". He prescribed dosages of Trilafon and Benadryl, which were administered to O'Brien, who was then sent to a seclusion area. Nurse Fabello was sent home, and defendant arrived to relieve her.

Burrows brought O'Brien some new pajamas about 15 minutes later and noticed at that time that O'Brien was having breathing difficulties, and, later, at approximately 7:30 P.M., when Burrows let O'Brien out of seclusion to eat her dinner, she noticed that O'Brien had been tearing at her tracheostomy wound. Burrows alerted her superiors, and while a doctor was summoned, defendant and another nurse put a straitjacket on O'Brien. Doctors Agnelli and Morrison arrived at approximately 8:00 P.M. and examined her, finding no "acute respiratory distress". They rebandaged the wound, and because they observed that O'Brien continued to try to touch the wound, they formally ordered that she be placed in a straitjacket for a three-hour period and given Benadryl.

After the doctors left, sometime after 8:00 P.M., O'Brien, while still in the straitjacket, roamed around the ward. She soon complained to both Burrows and the defendant that she was having trouble breathing and that she was spitting up blood. She asked defendant to call a doctor, but defendant refused, stating, "You've already seen a doctor. I'm not calling a doctor for you anymore". O'Brien also asked to use an inhalator, and requested certain medication, but defendant refused both requests. O'Brien frequently asked for cigarettes, but defendant refused to give them to her, saying "she doesn't deserve it".

Shortly thereafter, between 8:00 and 9:00 P.M., defendant was to take a 15-minute break and be relieved by Nurse Butler. Before defendant left, he walked over to O'Brien, put his fist under her chin, and said to her, "If you give any problem, this is what you're going to get." After he left, one of the nurse's aides reported to Butler that O'Brien was causing trouble. Butler responded that O'Brien "should have been tied", and she grabbed O'Brien and took her to the seclusion area. Butler then returned to the nurse's station, took some

long white ropes from a drawer, and returned to the seclusion area where she remained for about 10 minutes. When Butler came out again, she reported that "she fixed her now". When defendant returned from his break, he was informed that the staff "had trouble with Mary", and, "with a smile on his face", defendant entered the seclusion area and came out several minutes later.

At approximately 11:00 P.M., defendant called Dr. Agnelli to advise him that the straitjacket order was about to expire. Dr. Agnelli came to the ward to examine O'Brien, and he found her asleep, in a seclusion room. Because O'Brien was quiet again and breathing normally, Dr. Agnelli told defendant he could remove the straitjacket, and he authorized another injection of Benadryl.

However, the nurses who worked the midnight to 8:00 A.M. shift testified that when they arrived O'Brien was asleep, wearing a straitjacket. At about 1:00 A.M., O'Brien awoke and wandered around the ward, asking everyone for a cigarette. She was breathing heavily and continued to ask defendant for medication and the inhalator, which he refused. However, upon her request, defendant removed O'Brien's straitjacket. O'Brien spent the rest of the night wandering the ward, making demands and being "very hostile" to the staff. At about 4:00 A.M., O'Brien bothered the other patients and asked them for clothes. One patient, Ruth Rivera, gave her a pair of pants and a shirt which she put on. Defendant castigated her for wearing "civilian" clothes and ordered her to take them off. O'Brien went to her room and then came out again not wearing anything and walked to the nurse's station nude. Defendant again castigated her and chased her back to her room, where she put on a robe.

At about 5:30 A.M., decedent came to the nurse's station and urinated on the floor. As defendant and other nurses cleaned up, O'Brien ran down the hall and told another patient, Robert Preston, "Help me, please help me. * * * Tell John Johnson what they did to me". As Rivera and Preston looked on, defendant chased her, pulled her away from Preston, pushed one of her arms up behind her back, said "Enough" and took her to the seclusion area. Defendant took O'Brien's robe away from her and put his hand around her neck. Then, he knelt on her body in order to hold her down while he put a straitjacket on her and gave her an injection. Defendant then tied her feet to the bed.

When defendant later checked in the seclusion area, one-

half hour to an hour later, he came out looking pale and whispered to one of the nurse's aides. Then he picked up the telephone and yelled "code blue". Before help arrived, defendant removed the straitjacket and rope with which O'Brien was tied and dumped them with a pile of dirty clothes.

Doctors who arrived on the scene found O'Brien lying nude on a cot. Despite attempts to revive her, O'Brien died 30 to 40 minutes later.

An autopsy performed on O'Brien revealed vague bruising on the neck and ligature marks on her wrists and ankles. There was a bruise on one of her neck muscles as well as hemorrhaging on both sides of the larynx. In addition, O'Brien had a tear and bruise on her liver which had bled, along with bruising and bleeding in the back of the armpits, and near her spine at the bottom of the rib cage.

The hemorrhaging on the neck was determined to have resulted from "external force" or a "blunt force injury to the neck" which occurred shortly before death, and were consistent with "mechanical compression" which could have been applied by a person's hand around the neck. The liver laceration was consistent with trauma to the abdomen, such as someone kneeling on that part of the body. The cause of death was "asphyxiation by mechanical compression". Because of O'Brien's respiratory afflictions, it took less time for her to lose consciousness and die from such compression.

Based on this evidence, the jury found defendant guilty of both manslaughter in the second degree and criminally negligent homicide.

The defendant had moved to dismiss the indictment pursuant to CPL 290.10, and the trial court deferred the decision on the motion until after the jury returned its verdict. The court then granted the motion without elaborating its reasons, stating merely that the People failed to establish a prima facie case or prove either charge, citing *People v Futterman* (86 AD2d 70). The court commented on the record that "I don't think the People proved there was any criminal responsibility, but I don't condone the conduct here and I was very upset by not only Mr. Simon's conduct, but by the whole hospital's conduct in the handling of this patient."

We find that the trial court erred in granting the motion to dismiss the indictment, and accordingly we reverse and reinstate the jury's verdict.

CPL 290.10 (1) (a) authorizes the court to issue a trial order of dismissal when the "trial evidence is not legally sufficient

to establish the offense charged therein or any lesser included offense". "Legally sufficient evidence" is defined as competent evidence which, if accepted as true, would establish every element of the offense charged and the defendant's commission thereof. (CPL 70.10 [1].) The Court of Appeals has explained that this standard is not to be equated to proof beyond a reasonable doubt, and that the motion is to be decided without consideration of questions as to the quality or weight of the evidence, viewing all evidence in the light most favorable to the People. *(People v Sabella,* 35 NY2d 158, 167.)

Here, there was legally sufficient evidence to establish the elements of the crimes charged, manslaughter in the second degree and criminally negligent homicide. A person is guilty of manslaughter in the second degree when he recklessly causes the death of another person (Penal Law § 125.15 [1]) and of criminally negligent homicide when, with criminal negligence, he causes the death of another person. (Penal Law § 125.10.) Reckless criminal conduct occurs by being aware of and consciously disregarding a substantial and unjustifiable risk, and criminal negligence is the failure to perceive said risk, both of which constitute a gross deviation from the standard of care that a reasonable person would observe. (Penal Law § 15.05.)

While defendant argues against the quality and weight of the evidence, there was legally sufficient evidence viewed in a light favorable to the People that defendant caused her death. The medical evidence established that O'Brien died as a result of asphyxiation caused by mechanical compression of her neck and placement in restraints. The testimony established that defendant put his arm around her neck. Furthermore, defendant was seen kneeling on her body, consistent with the lacerations to her liver. Moreover, while O'Brien was in such dire straits, defendant left her completely restrained and in seclusion for over an hour.

Furthermore, there was legally sufficient evidence that defendant possessed a criminally culpable mental state—i.e., that he was aware of and consciously disregarded a substantial and unjustified risk (manslaughter: Penal Law § 15.05 [3]) and failed to perceive a substantial and unjustifiable risk (criminally negligent homicide: Penal Law § 15.05 [4]). Defendant was a licensed practical nurse who was admittedly well aware of O'Brien's respiratory condition. Nine hours before her death, he had summoned medical help for her because of these problems. In the intervening hours, defendant observed O'Brien's condition continually worsening, but he failed to

take responsive measures or summon a doctor. It is clear that at the time defendant choked and aggressively restrained her, he was aware of and completely disregarded the risks that he was creating, which caused her death. Additionally, it is clear that these risks were of such nature and degree that disregard thereof constituted a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

The trial court disregarded this legally sufficient evidence establishing the crimes when it conclusorily found that defendant's actions did not rise to the level of criminality. The only support given by the court was a citation to *People v Futterman* (86 AD2d 70, *supra*). However, the court's reliance on *Futterman* was misplaced. *Futterman* is only superficially similar to the case at bar. In *Futterman,* the defendant, a nurse in a psychiatric ward of a hospital, caused the death of a patient when, while in the course of a struggle, defendant choked him, causing his death. The Fourth Department found that the evidence was legally insufficient to support a verdict that defendant committed criminally negligent homicide since it found that defendant reacted to an emergency situation subduing an agitated person who was abusing an elderly female patient, especially where the victim involved in the struggle was an extremely violent person of unusual strength.

Here, there was no such emergency situation. Defendant's course of conduct transpired throughout the night, and while O'Brien was certainly agitated at the time defendant applied the fatal blows, she was not posing any physical threat to others present. Instead, O'Brien's erratic behavior appears to have irritated the hospital staff rather than to have posed a threat, and defendant's violent reaction was an unwarranted response to what can essentially be characterized as annoying behavior. Moreover, while the victim in *Futterman (supra,* at 74) was an extremely violent person of "unusual strength", here the victim was a five-foot-tall, 90-pound incapacitated woman, who was laboring for breath. Subduing her in such a violent manner was certainly conduct that was a gross deviation from a reasonable person's standard of conduct, as opposed to the conduct of the defendant in *Futterman.*

Defendant also argues that the prosecution case was so weak that the motion to dismiss was properly granted. Defendant contends that the case rests on the testimony of another patient, Ruth Rivera, who had a history of chronic mental illness, and that her testimony was irrational and delusionary. However, while there may be some confusion in her testimony

because Rivera collapsed the events of this 13-hour period, ranging from O'Brien's attack on Fabello until O'Brien's death, into one single incident, the details of the specific events that she recalled coincide with the testimony of the other patient, Preston, and of the hospital staff. Furthermore, defendant's contention that the People's case is based solely on Rivera's testimony is erroneous, as the record contains sufficient proof from the testimony of the other witnesses. In any event, the determination of a motion to dismiss for lack of legally sufficient evidence is not based on a consideration of the quality or weight of the evidence *(People v Sabella,* 35 NY2d 158, *supra).* The defendant's arguments raise questions about Rivera's credibility. In the final analysis, we observe that, viewing all of the evidence in a light most favorable to the People, there was legally sufficient evidence to support the conviction.

Accordingly, the motion for a trial order of dismissal should be denied, the jury's verdict reinstated, and the case remanded for sentencing. Concur—Carro, Rosenberger and Ellerin, JJ.

Kupferman, J. P., and Smith, J., dissent in a memorandum by Kupferman, J. P., as follows: I agree with the Trial Justice and would affirm the dismissal of the indictment, pursuant to CPL 290.10, on the ground of legal insufficiency of the trial evidence.

Initially, the decedent had been placed in a straitjacket pursuant to a physician's direction. As the majority opinion makes clear, the decedent's behavior made it difficult for any of the medical personnel to be other than uncivil. The restraining action taken by the defendant, while not to be commended, is nonetheless understandable.

Defendant's conviction for criminally negligent homicide required proof of criminal negligence (Penal Law § 125.10). The conviction for manslaughter in the second degree required evidence of recklessness (Penal Law § 125.15). It cannot be said that there was a failure to perceive the risks or disregard of the risk *(see, People v Warner-Lambert Co.,* 51 NY2d 295, 302, 303, *cert denied* 450 US 1031) in view of the obvious need for some kind of action. That the action taken may have been insensitive does not make it criminal. *(See, People v Futterman,* 86 AD2d 70.)

Inasmuch as the indictment was dismissed prior to sentencing, we do not have the power to vacate the conviction in the interest of justice or because the conviction was against the

weight of the evidence (CPL 330.30 [1]; *see, People v Colon*, 65 NY2d 888). However, I do not reach those questions because there is a sufficient basis for the trial court's determination under CPL 290.10.