OPINION OF THE COURT
Ruth Pickholz, J.
In 2011, Alicia Ifill, facing the prospect of spending the next 2 to 6 years in prison after being caught embezzling nearly $200,000, plotted to save herself by means of a yet another fraud. This time her dupes were to include the sentencing court and the District Attorney’s office. The plan required her to find a fresh source of funds and an actor who would lend convincing weft to the fabric of her deception. She stole from a second employer to obtain the cash she needed, and relied upon her uncle, defendant Henderson Ifill, to play the part of a multimillionaire. The two marched into the District Attorney’s office and successfully carried off the imposture. When her fabrications later unraveled Henderson Ifill found himself charged with two counts of criminal possession of stolen property in the second degree. He went to trial and was convicted of both counts. I reserved decision on his motions for a trial order of dismissal. I now find that, although the evidence at trial may have established that he engaged in criminal behavior, his acts cannot be construed to constitute the crime of criminal possession of stolen property.
The genesis of the indictment before me lies in another crime entirely. Sometime prior to the events at issue here Alicia Ifill stole approximately $190,000 from Stellar Management, for whom she worked. After the theft came to light the New York County District Attorney’s Office prosecuted her for the crime. The office apparently explored whether she could make restitution, but learned that she would not be able to do so. She pleaded guilty to grand larceny in the second degree in return for the court’s promise that she would receive an indeterminate *778 prison term of 2 to 6 years. The court did not remand her after the plea, and granted her a lengthy adjournment for sentence so that she could set her affairs in order. On the day set for sentence Ms. Ifill informed the court that she intended to hire a new attorney. The court then adjourned the case once more. Several days prior to the new sentence date the successor attorney, Alden Lewis, Esq., telephoned Mr. Kratville, the Assistant District Attorney in charge of the prosecution, to ask what his position would be if Ms. Ifill were to make restitution. Mr. Kratville responded that he was prepared to listen to a proposal. Two days later, on the rescheduled sentence date, Mr. Lewis came to court with his client and a cashier’s check for $75,000 dated October 5, 2011. The check was drawn on the account of Eagle Rock Capital Management. The court (Lewis Bart Stone, J.) adjourned the case to formulate a position on an appropriate sentence if she were to make full restitution, and for the People to determine exactly how much Ms. Ifill had stolen from Stellar Management. Mr. Kratville told Mr. Lewis that, as Ms. Ifill had stolen funds from Stellar, he needed proof that the source of the restitution was legitimate. Not only did he want to see documentation showing the source of the money, but he wanted to meet the person who was providing it.
Over the next few weeks Mr. Lewis sent the prosecutor several documents. He revealed that Ms. Ifill’s uncle, Henderson Ifill (the defendant before me), would be making restitution. Kratville told Lewis that he wanted to see much more documentation than he had so far been provided, and insisted on meeting the uncle. On November 14, 2011, a few days prior to the next scheduled court date, Lewis, Alicia Ifill, and a man who introduced himself as Henderson Ifill met Kratville at the District Attorney’s offices. They brought numerous documents with them. Henderson Ifill told Kratville that he had made a good living as an electrician for 42 years, and that he had invested his savings, which had appreciated greatly. He had accumulated several million dollars by the time he retired, and he was willing to give $75,000 to his niece so that she could make restitution. He made clear that his investments were the source of the $75,000 cashier’s check.[1] Kratville explained that $75,000 would not suffice, because the judge now wanted her to make full restitution in the amount of $188,000. Henderson Ifill stated *779 that he wanted some time to consider whether he wished to give this much larger sum. Kratville was nevertheless under the impression that he eventually would agree to provide all of the money.
At the end of the meeting Kratville spoke privately with Mr. Ifill. When the prosecutor asked him whether he expected his niece to repay him, Ifill told him that he imagined that his niece would make small payments from time to time, but that he would never get all of his money back. Kratville asked him why he was doing this for her. Ifill responded that he had made a great deal of money and felt that it was his duty to use it to benefit his family, especially a family member he loved and cared for so much.
Among the documents that Kratville received that day were records of a brokerage account with a company named BTIG. Henderson Ifill’s name did not appear on the BTIG documents, but Ifill represented that the money in the BTIG account was his. Kratville was also given bank records of two entities— Mountainview Special Fund and Eagle Rock Capital Management, and a Mountainview spreadsheet which showed Henderson Ifill putting in and taking out of the account sums in the amount of $50,000 and $100,000. It was explained to Kratville by both the uncle and niece that Mr. Ifill’s money in the BTIG brokerage account was invested in Mountainview Special Fund, but that he did not make direct transfers in or out of the fund. In order to minimize his tax exposure, the funds instead passed through Eagle Rock, which he owned. The Mountainview records confirmed that large transfers of money went to Eagle Rock. Nothing in the materials that Kratville had been given indicated that Henderson Ifill owned the assets of Eagle Rock. He therefore asked for additional documentation. He also asked to speak with someone from BTIG. Several days later he received documents that satisfied him as to Mr. Ifill’s ownership of Eagle Rock. He later spoke with someone who represented that he worked at BTIG. That person assured him that Ifill had put the money into the account bit by bit over many years. His suspicions allayed, Kratville did not make any further inquiries.
Kratville spoke to his supervisor about these events, and the two decided that if Henderson Ifill were to agree to pay the full restitution amount, they would recommend that the court sentence Alicia Ifill to a definite one-year jail term. The parties next appeared in court on December 22. Kratville explained that he was satisfied as to legitimacy of the money being *780 tendered, and reported the People’s recommendation. Judge Stone, however, was only willing to reduce the sentence to a l-to-3-year prison term. Ms. Ifill accepted the offer. Her attorney then handed Kratville two checks — the original $75,000 check and a check dated December 20, 2011 in the amount of $113,000. Like the first it was a cashier’s check drawn on Eagle Rock. Kratville did not look closely at either check, and did not notice that the payee in both cases was the New York County District Attorney’s Office. The case was adjourned for execution of sentence. Immediately after the calendar call he handed the checks to a representative of Stellar Management.
Stellar Management realized that the company could not deposit the checks because it was not the payee, and contacted the District Attorney’s Office. Kratville’s supervisor refused to take the checks back and deposit them in an office account, but proposed that the checks simply be exchanged for ones made out to Stellar Management. Kratville arranged for the swap to take place in court, but when he contacted Alden Lewis to arrange a date for the exchange, the attorney told him that Mr. Ifill was out of town for the week. The following week Lewis told him that Ifill’s return had been delayed. On the date of If-ill’s ostensible return Lewis reported that both the uncle and his niece were uncomfortable with withdrawing additional monies from the account without first redepositing the cashier’s checks. Kratville proposed that someone from Stellar Management go to the bank with Mr. Ifill, deposit the old checks and then get new ones. The date for execution of Ms. Ifill’s sentence was repeatedly adjourned while the parties worked out a date to carry out this procedure. Stellar Management retained possession of the checks throughout this period.
On February 7, 2012 a representative of Chase Bank telephoned Kratville. It appeared that there had been unauthorized checks drawn on an account owned by Eagle Rock Capital Management. Curiously, the payee on the checks was the New York County District Attorney’s Office. Did Kratville know anything about them? When the prosecutor explained that Henderson Ifill had authorized the withdrawals, the representative told him that he was unfamiliar with that name, and that the owner of the account was Nader Tavakoli, who was the CEO of Eagle Rock. Kratville then telephoned Tavakoli who informed him that Alicia Ifill worked in his office as an administrative assistant. It was she who had made the withdrawals from the Eagle Rock account at Chase. She did not *781 have authorization to do so. Henderson Ifill had no association with the company.
It was later discovered that letters authorizing the withdrawals and bearing Tavakoli’s forged signature had been submitted to Chase. Alicia Ifill was listed as the person to contact in each case. Ms. Ifill also had the access to documents and private information pertaining to the formation and ownership of Eagle Rock, its account with BTIG, and its related entities. The last page of one of the documents that Kratville had seen relating to the ownership of Eagle Rock had been altered. The document presented to Kratville indicated that Henderson Ifill was the sole owner of Eagle Rock. The original document shows that person to be Nader Tavakoli.
The next morning Kratville arranged to have Alicia Ifill arrested for the new thefts. After learning of these crimes Judge Stone sentenced her on the old indictment to an indeterminate prison term of 5 to 15 years. The District Attorney’s office later obtained the instant indictment charging her with many counts of grand larceny relating to her thefts from Eagle Rock, and with two counts of criminal possession of stolen property in the second degree relating to the two forged checks. She pleaded guilty to the new indictment on the eve of trial. Henderson Ifill was also charged in the new indictment, but only with the two counts charging possession of stolen property. Unlike his niece, he went to trial.
The People’s evidence at trial was substantially as I have summarized it here. The defendant was the only witness to testify for the defense. Although he admitted going to the District Attorney’s office to support his niece, he testified that he had no idea why she needed his support. He had not spoken to her for the previous two years and only went to the meeting after getting a phone call from Alicia’s mother. He had no discussions with Mr. Lewis either before or after the meeting and did not realize that his niece was facing criminal charges until he arrived at the meeting. No one had told him anything about the nature of the trouble she was in. He knew nothing about the papers that the attorney had passed to Mr. Kratville, or the two checks. He had never seen any checks. No one had pointed out to him that his name was on the documents being passed back and forth in the office. It was true that he met privately with the prosecutor at the close of the meeting, that he had mentioned that he was an electrician and was making over $100,000 a year and had been saving his money, but he was no *782 millionaire and had never represented that he was. He remembered that the prosecutor had mentioned that his niece had to pay back $150,000, but he had never promised to pay any money on her behalf. He did not have the means to give her such a sum. When he explained to Kratville that he could not pay anything, the prosecutor handed him his card, and he left. He had never stated that he was president of Eagle Rock, and had taken no part in withdrawing funds from that company.
The defense moved for a trial order of dismissal (see CPL 290.10) at the end of the People’s case, and at the end of the entire case. I reserved decision in each instance (CPL 290.10 [1] [b]). The jury returned a guilty verdict on both counts, and I must therefore “proceed to determine the motion upon such evidence as [I] would have been authorized to consider upon the motion had the court not reserved decision” (id.). “Legally sufficient evidence” is defined in CPL 70.10 (1) as competent evidence which, if accepted as true, would establish every element of the offense charged and the defendant’s commission thereof. I am required to view the evidence in the light most favorable to the People (see People v Contes, 60 NY2d 620 [1983]; People v Simon, 157 AD2d 508 [1990]), and must deny the motion if the trial evidence supports a guilty verdict with respect to the charged offense or a lesser included offense (CPL 290.10 [1] [a]).
A person commits the crime of criminal possession of stolen property in the second degree when he knowingly possesses stolen property which has a value in excess of $50,000, with the intent to benefit himself or a person other than the owner of the property, or to impede the recovery by the owner (see Penal Law § 165.52). The elements of the crime are thus: (1) possession of stolen property; (2) knowledge that the property has been stolen; (3) intent to benefit someone other than an owner or to impede recovery; and (4) value in excess of $50,000. The primary element in contention is the first. There was direct evidence that Alicia Ifill twice stole money in excess of $50,000, and a rational jury could have inferred that Henderson Ifill was aware that the first check she had drawn constituted stolen funds, and that, at the very least, he intended his misrepresentations to benefit her. The issue before me is whether there was legally sufficient evidence establishing that he pos *783 sessed the cashier’s checks.[2] The first count submitted to the jury charged him with possession of stolen property between October 5, 2011 and December 22, 2011, and refers to the $75,000 check. Count 2 charged him with possession of stolen property between December 20 and 22, 2011, and refers to the $113,000 check. In each instance the first date of the pair is the date that Alicia Ifill withdrew that sum in question from the Chase account, and the second is the date that Alden Lewis handed the check to Mr. Kratville.
The jury could have found that Mr. Ifill possessed the checks if they found that he had actual or constructive possession of them, either personally or by acting in concert with Alicia Ifill. There was no direct evidence that anyone but Mr. Lewis and Mr. Kratville had actual physical possession of the checks during the periods mentioned in the indictment. There was sufficient evidence to have permitted the jury to infer that Ms. Ifill had either actual or constructive possession of them at all times during this period. No evidence, circumstantial or otherwise established that Mr. Ifill had actual, physical possession of the checks. The evidence established that Ms. Ifill alone withdrew the money from Eagle Rock’s account, and there was no evidence that Mr. Ifill had a part in the thefts. Indeed, Mr. Ifill was not charged with the larcenies. Neither was there evidence permitting the inference that he had constructive possession of the checks or the stolen property. A person has constructive possession of an item when he has “dominion and control over the property by a sufficient level of control over the area in which [it] is found or over the person from whom [it] is seized” (People v Manini, 79 NY2d 561, 573 [1992] [internal quotation marks omitted]; see People v Muhammad, 16 NY3d 184 [2011]). There was no evidence where the checks were kept after they were drawn, but they were presumably in either Mr. Lewis’s offices or Ms. Ifill’s home. Nothing in the records supports an inference that Henderson Ifill had sole or joint dominion and control over these places. Neither does the record contain the slightest indication that he had dominion and control over Ms. Ifill and Mr. Lewis, the people who had actual possession of the checks. A person has dominion and control over a person when he exercises authority over that person (see People v Patel, 132 *784 AD2d 498, 502 [1987]). “[I]n [the] absence of. . . proof that [a] defendant [has] authority over [the] person [who is] in actual possession . . . , there is no constructive possession” (see People v Manini, 79 NY2d 561, 574 [1992]). There is no evidence here that the defendant ever commanded or instructed his niece or her attorney, or manifested any other indicia of control over them (cf. People v Rivera, 77 AD2d 538 [1980]; People v Diaz, 112 AD2d 311 [1985]). Moreover, although he feigned otherwise, nothing in the record establishes that he had any control over the stolen property itself, that is the power “to use or dispose” of the property (CJI2d[NY] Physical and Constructive Possession). A jury could not have found, therefore, that he had actual or constructive possession of the stolen property.[3]
The last possibility is that Mr. Ifill was guilty of possessing the property as an accomplice of his niece. Ms. Ifill was charged with stealing property from Eagle Rock and thereafter possessing the stolen property, but she was not charged with any other crime. It is relatively easy to see that Mr. Ifill’s actions aided her in perpetrating crimes with which neither of them were charged, e.g., fraud, identity theft (Penal Law art 190), and arguably hindering prosecution (Penal Law art 205). Like the person who, in a telephone call to the Assistant District Attorney, pretended that he worked for BTIG, and the pile of forged documents, he was an extremely convincing prop. But aiding her fraud on the District Attorney is not the same as aiding her possession of stolen property, and he is only liable as her accomplice if his actions aided her in the second regard. “Accomplice liability requires, at a minimum, awareness of the proscribed conduct and some overt act in furtherance of such” (see People v Hibbert, 282 AD2d 365, 366 [2001]). For this reason, Mr. Ifill is only liable as an accomplice if his acts furthered the specific proscribed conduct with which he was charged — the possession of the stolen checks.
The thrust of the People’s theory of his criminal liability is that he aided her possession of the checks by making misrepresentations about his ownership of Eagle Rock.[4] According to this theory, her ability to maintain possession of the first *785 check would, have come to an end much sooner had he not played the part she asked him to play. In addition, they argue that his actions enabled her to continue her ruse long enough that she could steal the $113,000 that became the second check, and thereby possess those stolen funds. Neither of these propositions stands up to analysis.
Mr. IfilTs performance was not intended to help her maintain possession of the first check, but the opposite. Although Ms. Ifill wished to obtain the funds at issue, that is transfer them to herself so that she had the wherewithal to pay Stellar, she had no need or desire to maintain possession once she had the money. To the contrary, she wanted to pass the checks on as quickly as possible. The object of the deception was to satisfy Mr. Kratville that Mr. Ifill was a bona fide source of the funds that had been tendered for restitution so that the Assistant District Attorney would accept the checks and agree to the imposition of a reduced sentence. There was nothing to be gained by continuing to hold on to the checks, as it was in Ms. IfilTs interests that sentencing occur expeditiously. The more there was delay, the greater the likelihood that someone at Chase Bank or Eagle Rock would discover the thefts and her scheme would be laid bare. This is exactly what happened.
The issue remains whether it was nevertheless possible for the jury to find that Mr. IfilTs deception aided his niece to maintain possession of the stolen property despite the fact that such was not his intent. I find that, as a matter of law, it was not. Mr. Kratville extended the period of Ms. IfilTs possession by insisting on a meeting which he required Mr. Ifill to attend. More broadly, the creation of a rich uncle, the role played by Mr. Ifill, made it necessary for the District Attorney to engage in an investigation which extended the period in which Ms. Ifill retained possession of the checks. In this way Mr. Henderson can be seen as indirectly extending the period of her possession. But that was neither his nor Ms. IfilTs doing. New York law imposes liability on an accomplice for a crime only if his or her aid is direct. Discussing the concept of accomplice liability in the context of a drug sale, the Court of Appeals stated,
“the People must prove not only that the defendant shared the requisite mens rea for the underlying *786 crime but also that defendant, in furtherance of the crime, solicited, requested, commanded, importuned or intentionally aided the principal in the commission of the crime. Although the case law discussing these criteria is somewhat fact-specific, integral to each inquiry is whether a défendant exhibited any calculated or direct behavior that purposefully affected or furthered the sale of the controlled substance. The key to our analysis is whether a defendant intentionally and directly assisted in achieving the ultimate goal of the enterprise . . . .” (See People v Bello, 92 NY2d 523, 526 [1998] [citations omitted and some emphasis added].)
Although Mr. Ifill may have directly assisted in achieving the ultimate goal of the fraud — hoodwinking the District Attorney — he was not charged with assisting in that crime. The ultimate goal of the crime of criminal possession of stolen property can only be Ms. Ifill’s possession of the checks. Insofar as this goal is concerned, Mr. Henderson’s aid was only indirect. Certainly his acts were tangential and incidental to her continued possession of the first check. Nothing he did directly “affected or furthered” that possession (id.). She had obtained the first check before he played his part. The People argue that the scheme would have come to an end sooner without his aid, but how long she might have held on to the check without his aid is purely speculative, as there is no evidence in the record that speaks to that question. Further, even if her scheme would have come to an end more quickly had he not spoken to Mr. Kratville, it does not follow that her possession would have ended any sooner. Even if it can be argued that Mr. Kratville and the court would not have accepted the first check had they not been taken in by his story, that only means that her possession of the check would have been longer in duration without Mr. Ifill’s aid. Put another way, by aiding her fraud, he shortened the time she exercised dominion and control over the check. Additionally, nothing in the record supports the possibility that Mr. Kratville would have discovered the true source of the $75,000 had Mr. Ifill not walked into his office. Assuming for the sake of argument that Mr. Kratville would have launched an investigation and discovered that she had stolen the money, nothing in the record suggests that Ms. Ifill would have been forced to disgorge the check, or would have lost dominion and control over it before December 22, when her possession actually came to an end. There was, thus, no proof in the record, or *787 any reasonable inference which could have been drawn from that evidence which supports the jury’s conclusion that he directly aided her possession of the first check. Accordingly, defendant’s motion as to count one is granted.
The People argue that Mr. Ifill is guilty of possessing the second check because his role-playing satisfied Mr. Kratville long enough for Ms. Ifill to carry out the second theft from Eagle Rock. The argument is, in other words, that by diverting Mr. Kratville he aided her to commit the second larceny, and that as he did so, he necessarily aided her to exercise dominion and control over the proceeds of that larceny. This argument falls because the evidence does not support the inference that he was an accomplice to the second larceny. There was no proof that he knew that his niece was about to carry out a second theft, let alone that he shared her larcenous intent.[5]1 reject the proposition that he is guilty of aiding her possession of the second check because, although he was not technically an accomplice to the larceny, his diversion nevertheless aided her theft in a lesser, general sense. The People cite no authority for such a proposition and I find none. Moreover, the jury could only have found him guilty of aiding her possession of the second check if they found that he knew that she would be in possession of the proceeds of a second larceny. Again, there is no proof which would have permitted the jury to infer, beyond a reasonable doubt, that he at any time knew that she intended a second larceny. As there is no way to infer that he had “awareness of the proscribed conduct” (People v Hibbert, 282 AD2d 365, 366 [2001]) there is an additional reason why he cannot be found guilty of possessing the second check. Defendant’s motion as to count 2 is therefore also granted.
Accordingly, defendant Henderson Ifill’s motion for a trial order of dismissal is granted in its entirety.

. The $75,000 check was presumably still in the possession of Mr. Lewis at this time. Mr. Kratville did not accept it on the previous court date. He did not remember if Lewis or anyone else brought it to the meeting at his office.

. The People never explicitly stated that their theory was the stolen property referred to the physical checks, or to the money they represented. No one argues that the result here depends upon that distinction (see People ex rel. Briggs v Hanley, 226 NY 453 [1919]; People v Gbohou, 186 Misc 2d 324 [2000]).

. It was for these reasons that I did not instruct the jury as to constructive possession.

. I instructed the jury that they could find Mr. Ifill guilty if they found that, knowing that the check that Alicia Ifill’s attorney presented to the District Attorney represented stolen funds, and with the intent to impede recovery of the funds by Eagle Rock, or to benefit Alicia Ifill or himself, he *785 aided Alicia Ifill to possess those funds. I also instructed them that they were to acquit him if they found that his alleged misrepresentations did not have the effect of helping her to possess the funds.

. Perhaps for these reasons, he was not charged with the theft.