**Margaret E. WHEELER, Plaintiff,**

v.

**Karmen COURET and Laurie Culbert, Defendants.**

**No. 99 CIV. 11550(GEL).**

United States District Court, S.D. New York.

Oct. 15, 2001.

**332**

Kevin J. Brennan, Esq., Dwyer & Brennan, New York City, for Plaintiff Margaret E. Wheeler.

Christopher Keane, Esq., Russo, Keane & Toner, LLP, New York City, for Defendant Karmen Couret.

Stuart Haas, Esq., Law Offices of Charles X. Connick, P.L.L.C., Mineola, NY, for Defendant Laurie Culbert.

## OPINION AND ORDER

LYNCH, District Judge.

Plaintiff Margaret E. Wheeler, an employee of a veterinary hospital in New York, brings this action in negligence and strict liability against defendants Karmen Couret, a dog owner, and Laurie Culbert, a veterinarian, as a result of being bitten by a sick dog at her place of employment. Defendants move for summary judgment, arguing variously that the suit against the veterinarian, a fellow-employee, is barred by the New York Workers' Compensation Law, that the cause of action in strict liability against the dog owner fails because of the absence of evidence of vicious propensities on the part of the dog, and that the action fails against both defendants by reason of assumption of risk. For the reasons that follow, summary judgment is granted for defendant Culbert, but denied as to defendant Couret.

### Facts

The basic facts of the incident are, for the most part, undisputed. Plaintiff Wheeler worked as office manager of an animal hospital in Manhattan. Defendant Culbert was employed at the same location as a veterinarian. On November 5, 1999, Culbert brought to the hospital a dog, an English pointer named Sebastian, who was owned by defendant Couret. Sebastian had been diagnosed with a painful cancerous condition, and Culbert had agreed to

bring him to the hospital for a consultation with a staff oncologist. Culbert, a friend of Couret, was aware of Sebastian's condition, and was also aware that on two previous occasions Sebastian had bitten people who approached him. (The parties disagree about the circumstances and implications of these prior incidents.) While Culbert may have said something about Sebastian's condition to another employee, there is no contention that either Culbert or that employee told Wheeler anything about the dog's illness or his prior biting episodes.

Culbert left the dog, unattended and unmuzzled, in the reception area of the hospital, near where Wheeler was working. Sebastian lay quietly near a set of drawers under the fax machine. After a short time period (the parties do not agree on the time, but in no one's estimate more than twenty minutes), Wheeler, in the performance of her regular duties, went to retrieve something from a drawer near the dog, and in the process bent over, bringing her face within fairly close proximity to the dog's muzzle. Sebastian responded by biting Wheeler in the face, resulting in the injuries for which she seeks compensation from Culbert and Couret.

## Discussion

### I. Choice of Law

As federal jurisdiction in this matter is based on diversity of citizenship (plaintiff is a citizen of New York, and both defendants are citizens of Connecticut), state law will govern the substantive issues, and the conflict of laws rules of the forum state, New York, determine which state's laws control. *See, e.g., Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The parties appear to agree that New York law applies, and that is the correct conclusion. In tort cases, New York courts apply the law of the state with the greater interest

in having its law applied to the issue in question. *Padula v. Lilarn Properties Corp.*, 84 N.Y.2d 519, 620 N.Y.S.2d 310, 644 N.E.2d 1001 (1994). As to the negligence claim against Culbert, the allegedly negligent acts, any contributory conduct of plaintiff, and the resulting injury all occurred in New York, and New York is the site of the employment of both parties, so there is no question that New York negligence and Workers' Compensation law apply. While there may be a colorable argument that, because the dog and his owner lived in Connecticut, Connecticut law on the strict liability of animal owners might apply to the strict liability claim against Couret, defendant Couret does not make that argument, and rightly so: the injury occurred in New York, and Couret deliberately sent her dog to New York for treatment, thus invoking the protections and liabilities of New York law. New York has a strong, legitimate interest in applying its law to out-of-state animal owners who send their animals into the state.

### II. Workers' Compensation

Culbert contends that Wheeler's action against her is precluded by New York's Workers' Compensation statutes. Like most states, New York has adopted a comprehensive, no-fault system for compensating employees for any "injury arising out of and in the course of employment." N.Y. Workers' Comp. L. § 10(1). This system provides the "exclusive remedy to an employee ... when such employee is injured or killed by the negligence or wrong of another in the same employ." *Id.* § 29(6). *See also id.* § 11 (workers' compensation is exclusive liability of employer). Wheeler argues, however, that Culbert has failed to provide sufficient evidence that she and Wheeler were employed by the same employer. This argument is unpersuasive.

The parties agree that Wheeler was employed by Veterinary Centers of America, Inc. ("VCA") (Wheeler Aff. Ex. 1.) Culbert's employment contract for 1999 was with Veterinary Centers of America–New York, P.C. (Haas Aff. Ex. G), and her 1999 W2 form identified her employer as Manhattan Veterinary Group, P.C. (Brennan Aff. Ex. 2). At her deposition, Culbert testified that she regarded these two entities as the same, but it was also clear she did not have specific knowledge of the corporate structure or the relationships among the two entities. (Culbert Dep. at 49–50.)

Culbert, however, provides an affidavit from Lawrence Cohen, who, according to Culbert's testimony, was the "regional medical director" of VCA, and the person with whom she discussed her salary and conditions of employment. (Culbert Dep. at 37.) Dr. Cohen's affidavit makes clear that the veterinary hospital where Wheeler and Culbert worked "operated as a single integrated institution providing veterinary services." VCA provided "administrative services" to the hospital pursuant to a management agreement, and the non-professional personnel of the hospital, including Wheeler, were employed by VCA to work at the hospital pursuant to that agreement. The medical staff of the hospital, including Culbert and Sheri Berger, a veterinarian who served as medical director of the hospital, were employed by a separate entity, which at different times was known as VCA–New York, P.C. and Manhattan Veterinarian Group, P.C. Berger, as the medical director of the hospital, was the direct supervisor of both Wheeler and Culbert, with day-to-day supervision of the activities of both, and authority to hire and fire both, subject to Cohen's approval. (Cohen Aff., Haas Aff. Ex. C.)

Cohen's affidavit also asserts that VCA operated a single payroll department for employees of both entities; that both Wheeler and Culbert were accordingly paid from the same bank account; that both Wheeler and Culbert received the same, VCA-provided, manuals on safety and employee rights and responsibilities; and that both Wheeler and Culbert were covered under the same Workers' Compensation policy, health insurance policy and retirement plan, all provided by VCA. (*Id.*)

Despite ample opportunity to develop further evidence through discovery, Wheeler offers no evidence of any kind to contradict or cast doubt on Cohen's statements, and no evidence of her own concerning the corporate structure or operating realities of VCA and its Manhattan affiliate.

The undisputed Cohen testimony clearly establishes that Wheeler and Culbert were "in the same employ" under New York law. The New York courts have recognized that "an employer's organization into separate legal entities does not preclude a finding that an employee is limited to benefits under the Workers' Compensation Act." *Ramnarine v. Mem'l Ctr. for Cancer and Allied Diseases,* 722 N.Y.S.2d 493, 494 (1st Dept.2001). That case, which is strikingly similar to the instant case, illustrates New York's practical approach to determining employment status for purposes of the Workers' Compensation laws. In *Ramnarine,* the plaintiff was employed by Memorial Sloan Kettering Cancer Center, but was injured on property owned by Memorial Center for Cancer and Allied Diseases, a separate corporate entity from his employer. When Ramnarine sued the latter entity, the Appellate Division ruled that summary judgment for the defendant was appropriate, holding that although the defendant was a separate corporation from Ramnarine's employer, he could not sue either corporation. Both entities (along with at least two other affiliated corpora-

tions) functioned as an integrated health care facility,

> directed by a common management and function[ing] under a common budget.... There is one human resources department, and a single policy manual sets forth common rules and policies of employment. A common payroll department issues paychecks to all employees, and a single premium is paid for an insurance policy covering all four entities. The organization holds itself out to the public as an integrated institution known as Memorial Sloan Kettering Cancer Center.

722 N.Y.S.2d at 494. But for the fact that Sloan Kettering treats humans and VCA treats animals, the court could have been describing the employer in this case.[1]

Accordingly, under New York law, Culbert and Wheeler were fellow-employees. Because Wheeler was eligible for and received Workers' Compensation benefits, she is precluded under New York law from suing Culbert, and Culbert is entitled to summary judgment.

## III. *Strict Liability*

Couret contends that she, too, is entitled to summary judgment, because under New York law a dog owner is strictly liable for injuries caused by the dog if she is aware that the dog has "vicious propensities."

*Arbegast v. Bd. of Educ. of S. Berlin Cent. Sch.,* 65 N.Y.2d 161, 164, 490 N.Y.S.2d 751, 480 N.E.2d 365 (1985); *Muller v. McKesson,* 73 N.Y. 195, 200 (1878).[2] She argues that there is no evidence that Sebastian had such propensities.

 Wheeler, however, points to evidence sufficient to create an issue of fact for jury resolution on this question. A "vicious propensity" is simply the tendency of the dog to perform an act which might injure another. *See, e.g., Wheaton v. Guthrie,* 89 A.D.2d 809, 453 N.Y.S.2d 480 (4th Dep't 1982); 1B *N.Y. Pat. Jury Inst.Civil* 1016 (3d ed.2000). Couret points out that there is evidence that Sebastian's prior biting episodes were minor and provoked, and submits there is no doubt a jury could find on this record that he was a gentle creature. But a reasonable factfinder could also find the contrary. It is up to a jury to decide the significance of Sebastian's prior actions, and in doing so the jury would also be entitled to consider that Couret knew that whatever the dog's prior disposition, he was currently in pain. A jury could also find that—as a veterinarian herself—Couret was aware that a dog in such condition could predictably behave more erratically than usual. Indeed, there is evidence in the record that Couret was sufficiently concerned about Sebastian's state of mind that she

---

1. Although *Ramnarine,* as a decision of an intermediate appellate court, is not strictly binding on this Court's interpretation of New York law, *see e.g., Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967) ("in diversity cases ... while the decrees of lower state courts should be attributed some weight ... the decision [is] not controlling ... where the highest court of the State has not spoken on the point") (internal quotation marks omitted) (alterations in original); *Collette v. St. Luke's Roosevelt Hosp.,* 132 F.Supp.2d 256, 261–62 (S.D.N.Y. 2001) (same), the decision is completely in accord with principles announced by the New York Court of Appeals, *see Thompson v.*

*Grumman Aerospace Corp.,* 78 N.Y.2d 553, 578 N.Y.S.2d 106, 585 N.E.2d 355 (1991) (worker employed by one company to work exclusively for another at the latter's plant was a "special employee" of the latter as well as a "general employee" of the former, and could not sue the latter for workplace injury), and is entirely persuasive to this Court.

2. Wheeler does not assert a cause of action in negligence against Couret, and there is no evidence that she was negligent in any way, having entrusted her dog to a qualified veterinarian who had full knowledge of the dog's condition and history.

had specifically warned Culbert not to leave the dog unsupervised or in an area where he would be exposed to the public, and that she decided not to leave the dog near the reception desk at her own workplace. (Couret Dep. at 46–48.) Further, Culbert passed that warning along to at least one employee of the hospital. (Culbert Dep. at 67.) Under these circumstances, it does no disrespect to the memory of the late Sebastian to conclude that, even if he was of sterling character, a reasonable jury could find that, at least in his unfortunate condition in November 1999, he posed a danger of biting and thus had "vicious propensities" within the meaning of New York law.

## IV. *Assumption of Risk*

■ Couret further argues, however, that even if she might otherwise be strictly liable for Sebastian's actions, she is nevertheless entitled to summary judgment because Wheeler assumed the risk of injury by bringing her face into close proximity to the dog's, an action VCA's own safety manual warned employees not to perform. But while Wheeler's actions could, under New York law, be taken into account by a jury in calculating damages, they do not entitle Couret to summary judgment.

The starting point in assessing this issue is New York's comparative causation statute, N.Y. C.P.L.R. art. 14–A. By that statute, adopted in 1975, New York adopted a regime of comparative fault or comparative causation, replacing the former common-law rules under which assumption of risk and contributory negligence constituted complete defenses against a plaintiff's action for negligence. The statute provides:

> In any action to recover damages for personal injury, injury to property, or wrongful death, the culpable conduct attributed to the claimant or to the decedent, including contributory negligence of assumption of risk, shall not bar recovery, but the amount of damages otherwise recoverable shall be diminished in the proportion which the culpable conduct attributable to the claimant or decedent bears to the culpable conduct which caused the damages.

N.Y. C.P.L.R. § 1411. It is settled that this statute applies, as its language states, to "*any* action ... for personal injury," including actions based on strict liability as well as actions for negligence. *Arbegast,* 65 N.Y.2d at 167–68, 490 N.Y.S.2d 751, 480 N.E.2d 365.

Although § 1411 seems to settle that assumption of risk always goes only to the jury's assessment of damages, Couret correctly points out that New York law is actually more complex. In *Arbegast,* the New York Court of Appeals noted that the common law distinguished between two separate defenses labeled assumption of risk:

> Express assumption, which was held to preclude any recovery, resulted from agreement in advance that defendant need not use reasonable care for the benefit of plaintiff and would not be liable for the consequence of conduct that would otherwise be negligent. [Citations omitted.] Implied assumption was founded not on express contract, but on plaintiff's voluntarily encountering the risk of harm from defendant's conduct with full understanding of the possible harm to himself or herself [citations omitted], and according to some authorities required that plaintiff's consent to the risk involved be unreasonable under the circumstances.

65 N.Y.2d at 169, 490 N.Y.S.2d 751, 480 N.E.2d 365. The Court then interpreted § 1411, in effect, to apply its comparative damages analysis in place of *implied* assumption of risk, but not to preclude a complete defense of *express* assumption of risk, at least in cases where public policy

does not prohibit agreements limiting liability. *Id.* at 169–70, 490 N.Y.S.2d 751, 480 N.E.2d 365.

Seizing on this distinction, Couret argues that Wheeler's conduct amounted to an express assumption of risk, and therefore can provide a complete defense. Even if this argument represented a correct statement of law, it should be noted, summary judgment would not be appropriate, for it would be a question of fact, about which reasonable jurors could disagree, whether Wheeler's actions in any way constituted a voluntary assumption of the risks of being bitten. But more fundamentally, Couret has the law exactly backwards.

■ There is no evidence in the record establishing or even suggesting that Wheeler contractually agreed with her employer—and certainly not with Couret—that she would bear the risk of harm from any animal she encountered in her employment. The conduct relied on by Couret—such as Wheeler's knowledge that a dog might become aggressive if she came into close proximity, especially if the dog was ill; her familiarity with the VCA safety manual, which specifically warned against bringing one's face close to a dog's; and her action in nevertheless bending over and putting her face within a foot of Sebastian's, knowing that Sebastian was at the hospital for treatment and was not familiar with her (Couret Mem. at 4–5)—constitutes, at best, a classic argument for *implied* assumption of risk, as defined in *Arbegast,* and not for the kind of express assumption of risk that could constitute a complete defense. In the words of the Court of Appeals, Couret's argument is "founded not on express contract, but on plaintiff's voluntarily encountering the risk of harm from defendant's conduct with full understanding of the possible harm to ... herself." 65 N.Y.2d at 169, 490 N.Y.S.2d 751, 480 N.E.2d 365.

The disposition of *Arbegast* itself illustrates that these words were no mere dictum or imprecise generalization. In that case, the plaintiff was injured playing the dubious sport of "donkey basketball," and sued the sponsor of the event and the company that provided the donkeys. The Court ruled that since "there is evidence from which the jury could have concluded that plaintiff had knowledge of the risk and by participating in the games voluntarily assumed it," she "would therefore have been entitled to a comparative causation charge on implied assumption of the risk." *Id.* at 171, 490 N.Y.S.2d 751, 480 N.E.2d 365. The Court, however, found that this was nevertheless a case of *express* assumption of risk entitling the defendants to a directed verdict, because plaintiff "conceded that she was told before the games began that 'participants are at their own risk.'" *Id.* The Court thus made crystal clear that engaging in dangerous conduct with full knowledge of the risks—the conduct Couret charges Wheeler with in this case—constitutes matter only for the jury's assessment of comparative causation at the damages stage of the case, and that only a contractual undertaking to bear all damages from the activity constitutes a complete defense of express assumption. Having failed to establish any such contractual commitment by Wheeler, Couret is not entitled to that defense.

■ One further complexity of New York law requires elaboration. Couret also relies on another line of cases in which the term "assumption of risk" has sometimes been used in yet another context. These cases, primarily dealing with the world of organized sports, hold that an owner or operator of an athletic facility owes no duty of care to participants who are injured on their premises while engaging in voluntary sports activities, when

the participant is aware of the risks, has an appreciation of their nature, and voluntarily assumes the risks. Because there is no duty owed, the defendant is entitled to a complete defense, and not merely a comparative fault assessment, where this doctrine applies. The most recent and comprehensive decision of the Court of Appeals synthesizing this doctrine is *Morgan v. State of New York*, 90 N.Y.2d 471, 662 N.Y.S.2d 421, 685 N.E.2d 202 (1997), which is not cited by any of the parties.

Certainly this doctrine, which is sometimes referred to as "primary" assumption of risk, *Turcotte v. Fell*, 68 N.Y.2d 432, 438, 510 N.Y.S.2d 49, 502 N.E.2d 964 (1986); *Hommel v. Benshoff*, 178 Misc.2d 1038, 682 N.Y.S.2d 546, 548 (1998), bears some resemblance to the kind of implied assumption of risk discussed in *Arbegast*. In *Morgan*, however, the Court comprehensively reconciled this line of cases, which derives from the pre-comparative fault case of *Maddox v. City of New York*, 66 N.Y.2d 270, 496 N.Y.S.2d 726, 487 N.E.2d 553 (1985), with *Arbegast*. The Court situated cases like *Maddox* and *Turcotte* squarely in the context of athletic activities due to the need to strike a "balance ... at the threshold duty stage of responsibility and adjudication" that will "support a social policy to 'facilitate free and vigorous participation in athletic activities.'" *Morgan*, 90 N.Y.2d at 484, 662 N.Y.S.2d 421, 685 N.E.2d 202, *quoting Benitez v. New York City Bd. of Educ.*, 73 N.Y.2d 650, 657, 543 N.Y.S.2d 29, 541 N.E.2d 29 (1989). As the Court pointed out, the doctrine in question is not really a separate defense at all, but a question that "serves to define the standard of care under which a defendant's duty is defined and circumscribed 'because assumption of risk in this form is really a *principle of no duty*, or no negligence and so *denies the existence of any underlying cause of action*.'" *Morgan*, 90 N.Y.2d at 485, 662 N.Y.S.2d 421, 685 N.E.2d 202, *quoting*

Prosser and Keeton, *Torts* § 68, at 496–97 (5th ed.1984) (emphasis added by Court of Appeals).

Indeed, as the Court had earlier pointed out in *Turcotte*, in this context,

the "doctrine [of assumption of risk] deserves no separate existence (except for *express* assumption of risk) and is simply a confusing way of stating certain no-duty rules." (James, *Assumption of Risk: Unhappy Reincarnation*, 78 Yale L.J. 185, 187–188). Accordingly, the analysis of care owed to plaintiff in the professional sporting event by a coparticipant and by the proprietor of the facility in which it takes place must be evaluated by considering the risks plaintiff assumed when he elected to participate in the event and how those assumed risks qualified defendants' duty to him.

68 N.Y.2d at 438, 510 N.Y.S.2d 49, 502 N.E.2d 964. The doctrine's content is really more closely associated with *express* assumption of risk than with the kind of behavior pointed to by Couret, because it relates to an *ex ante* consent or agreement by the participant to accept responsibility for whatever risks of injury are inherent in the sport. In *Turcotte*, for example, the Court of Appeals quoted prominent commentators as suggesting that the doctrine applies where "the plaintiff, in advance, has given his ... consent to relieve the defendant of an obligation of conduct toward him, and to take his chances of injury from a known risk arising from what the defendant is to do or leave undone," and analogizing it to the doctrine of consent in intentional torts. *Id.* at 438, 510 N.Y.S.2d 49, 502 N.E.2d 964, *quoting* Prosser and Keeton at 480–81.

While there has been some debate in the New York courts about whether this doctrine is strictly limited to sports and entertainment activities or only "typically" applied in such cases, *see Hommel*, 682

N.Y.S.2d at 548–49, Couret cites no case, and the Court has found none, applying this doctrine to a case analogous to this one.[3] Neither logic nor authority supports its extension here, for there is surely nothing to indicate that New York courts would find that a dog owner owed no duty to veterinarians' staff members treating a dog for whose behavior the owner would otherwise be absolutely liable. Indeed, Couret does not even argue that veterinarians' office staff have given up-front consent to being bitten by dogs as part of the normal incidents of their work, as professional baseball players (*Maddox*), jockeys (*Turcotte*), or participants in bobsledding, karate and tennis (*Morgan*) have been held to accept the ordinary risks inherent in their sports. As noted above, Couret's argument is rather that Wheeler assumed the risk by her specific and arguably careless behavior in coming too close too fast to a sick animal. That argument calls for precisely the sort of assessment of the parties' respective contributions to the injury provided for by § 1411.

None of the various strands of assumption of risk doctrine, in short, justify an entry of summary judgment for Couret.

### Conclusion

For the reasons stated above, defendant Culbert's motion for summary judgment is granted, and defendant Couret's motion is denied.

SO ORDERED.

---

3. The one case cited by Couret as applying an assumption of risk defense to dog bite cases, *Smith v. Sapienza*, 115 A.D.2d 723, 496 N.Y.S.2d 538 (2d Dept.1985), is completely inapposite. There, the Court held that the assumption of risk defense was properly stricken, because the only applicable complete defense was *express* assumption of risk, citing *Arbegast*, and the three-year-old plaintiff was incapable of agreeing to assume the risk. The case in no way supports any defense for Couret here.