*102 OPINION OF THE COURT
Fuchsberg, J.
After trial by jury in a negligence suit for personal injuries, the plaintiff, Vincent N. Trimarco, recovered a judgment of $240,000. A sharply divided Appellate Division having reversed on the law and dismissed the complaint, our primary concern on this appeal is with the role of the proof plaintiff produced on custom and usage. The ultimate issue is whether he made out a case.
The controversy has its genesis in the shattering of a bathtub’s glass enclosure door in a multiple dwelling in July, 1976. Taking the testimony most favorably to the plaintiff, as we must in passing on the presence of a prima facie case, we note that, according to the trial testimony, at the time of the incident plaintiff, the tenant of the apartment in which it happened, was in the process of sliding the door open so that he could exit the tub. It is undisputed that the occurrence was sudden and unexpected and the injuries he received from the lacerating glass most severe.
The door, which turned out to have been made of ordinary glass variously estimated as one sixteenth to one quarter of an inch in thickness, concededly would have presented no different appearance to the plaintiff and his wife than did tempered safety glass, which their uncontradicted testimony shows they assumed it to be. Nor was there any suggestion that defendants ever brought its true nature to their attention.
Undeveloped in the trial record is the source of a hospital record entry which ascribed the plaintiff’s injuries to a “fall through his bathroom glass door”. Obviously, this may have been taken into account by the jury, since its verdict called for a reduction of its $400,000 gross assessment of damages by 40% to account for contributory negligence.[1]
As part of his case, plaintiff, with the aid of expert testimony, developed that, since at least the early 1950’s, a *103 practice of using shatterproof glazing materials for bathroom enclosures had come into common use, so that by 1976 the glass door here no longer conformed to accepted safety standards. This proof was reinforced by a showing that over this period bulletins of nationally recognized safety and consumer organizations along with official Federal publications had joined in warning of the dangers that lurked when plain glass was utilized in “hazardous locations”, including “bathtub enclosures”.[2] Over objection, the trial court also allowed in sections 389-m and 389-0 of New York’s General Business Law, which, enacted in 1972 though effective only as of July 1, 1973, required, on pain of criminal sanctions, that only “safety glazing material” be used in all bathroom enclosures after the effective date;[3] however, the court carefully cautioned the jury that, because the statute did not apply to existing installations, of which the glass in question was one, it only was to be considered “along with all the other proof in this case, as a standard by which you may measure the conduct of the defendants”. And, on examination of the defendants’ managing agent, who long had enjoyed extensive familiarity with the management of multiple dwelling units in the New York City area, plaintiff’s counsel elicited agreement that, since at least 1965, it was customary for landlords *104 who had occasion to install glass for shower enclosures, whether to replace broken glass or to comply with the request of a tenant or otherwise, to do so with “some material such as plastic or safety glass”.
In face of this record, in essence, the rationale of the majority at the Appellate Division was that, “assuming that there existed a custom and usage at the time to substitute shatterproof glass” and that this was a “better way or a safer method of enclosing showers” (82 AD2d, p 23), unless prior notice of the danger came to the defendants either from the plaintiff or by reason of a similar accident in the building, no duty devolved on the defendants to replace the glass either under the common law or under section 78 of the Multiple Dwelling Law.[4] To this the court added that, were it not dismissing, it would have ordered a new trial because, in its view, the admission of the afore-mentioned sections of the General Business Law, even with the reservations attached by the Trial Judge, constituted reversible error.
In a dissenting opinion, Justice Leonard Sandler disagreed on both counts; on the underlying liability issue, he found that the plaintiff had presented a clear question of fact for the jury and, on the evidentiary one stemming from the submission of the General Business Law, after noting that a careful marshaling of authorities had persuaded him that it was a “close question” (82 AD2d, p 28), he opined that whether the statute should have gone to the jury was properly within the Trial Judge’s discretion. Concurring in part and dissenting in part, Justice Arnold Fein, writing separately, took the position that, while there indeed was “ample” evidence of custom and usage to support the plaintiff’s verdict, a new trial was required since the advice to the jury of the contents of the statute, no matter how cushioned by qualifications, “could only be misleading” (82 AD2d, p 30).
For the reasons which follow, we agree with Justice Sandler and Justice Fein that plaintiff established a *105 prima facie case. However, we would not disturb the conclusion of Justice Fein and the majority that the General Business Law did not belong in the case.
Our analysis may well begin by rejecting defendants’ contention that the shower door was not within the compass of section 78 of the Multiple Dwelling Law. From early on, it was understood that this statute was enacted in recognition of the reality that occupants of tenements in apartment houses, notwithstanding their control of the rented premises, as a practical matter looked to their landlords for the safe maintenance of the tenanted quarters as well. The result was that, if responsibility for keeping “every part thereof * * * in good repair” was not placed on the landlords, defects would remain unremedied (Multiple Dwelling Law, § 78; see Altz v Leiberson, 233 NY 16, 19). Therefore, though early cases may have chosen to give the statutory phrase “every part” a restrictive connotation (e.g., Kitchen v Landy, 215 App Div 586 [defective coal stove]; and Boylan v 1986 Grand Ave. Realty Corp., 169 Misc 881 [defective clothes drier]), later cases made clear that the remedial reach of the legislation mandated a more expansive interpretation under which fixtures or appliances furnished by the landlord were found to be within the statutory intendment (Herring v Slattery & Bros., 266 App Div 719, affd 291 NY 794 [defective gas range]; Rosen v 2070 Davidson Ave. Corp., 246 App Div 588, mot for lv to app den 270 NY 676 [defective clothes drier]).
Which brings us to the well-recognized and pragmatic proposition that when “certain dangers have been removed by a customary way of doing things safely, this custom may be proved to show that [the one charged with the dereliction] has fallen below the required standard” (Garthe v Ruppert, 264 NY 290, 296). Such proof, of course, is not admitted in the abstract. It must bear on what is reasonable conduct under all the circumstances, the quintessential test of negligence.
It follows that, when proof of an accepted practice is accompanied by evidence that the defendant conformed to *106 it, this may establish due care (Bennett v Long Is. R. R. Co., 163 NY 1, 4 [custom not to lock switch on temporary railroad siding during construction]), and, contrariwise, when proof of a customary practice is coupled with a showing that it was ignored and that this departure was a proximate cause of the accident, it may serve to establish liability (Levine v Blaine Co., 273 NY 386, 389 [custom to equip dumbwaiter with rope which does not splinter]). Put more conceptually, proof of a common practice aids in “formulating] the general expectation of society as to how individuals will act in the course of their undertakings, and thus to guide the common sense or expert intuition of a jury or commission when called on to judge of particular conduct under particular circumstances” (Pound, Administrative Application of Legal Standards, 44 ABA Rep, 445, 456-457).
The source of the probative power of proof of custom and usage is described differently by various authorities, but all agree on its potency. Chief among the rationales offered is, of course, the fact that it reflects the judgment and experience and conduct of many (2 Wigmore, Evidence [3d ed], § 461; Prosser, Torts [4th ed], § 33). Support for its relevancy and reliability comes too from the direct bearing it has on feasibility, for its focusing is on the practicality of a precaution in actual operation and the readiness with which it can be employed (Morris, Custom and Negligence, 42 Col L Rev 1147, 1148). Following in the train of both of these boons is the custom’s exemplification of the opportunities it provides to others to learn of the safe way, if that the customary one be. (See Restatement, Torts 2d, § 295A, Comments a, b.)
From all this it is not to be assumed customary practice and usage need be universal. It suffices that it be fairly well defined and in the same calling or business so that “the actor may be charged with knowledge of it or negligent ignorance” (Prosser, Torts [4th ed], § 33, p 168; Restatement, Torts 2d, § 295A, p 62, Comment a).
However, once its existence is credited, a common practice or usage is still not necessarily a conclusive or even a compelling test of negligence (1 Shearman & Redfield, Negligence [rev ed], § 10). Before it can be, the jury must *107 be satisfied with its reasonableness, just as the jury must be satisfied with the reasonableness of the behavior which adhered to the custom or the unreasonableness of that which did not (see Shannahan v Empire Eng. Corp., 204 NY 543, 550). After all, customs and usages run the gamut of merit like everything else. That is why the question in each instance is whether it meets the test of reasonableness. As Holmes’ now classic statement on this subject expresses it, “[w]hat usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not” (Texas & Pacific Ry. Co. v Behymer, 189 US 468, 470).
So measured, the case the plaintiff presented, even without the insertion of sections 389-m and 389-o of the General Business Law, was enough to send it to the jury and to sustain the verdict reached. The expert testimony, the admissions of the defendant’s manager, the data on which the professional and governmental bulletins were based, the evidence of how replacements were handled by at least the local building industry for the better part of two decades, these in the aggregate easily filled that bill. Moreover, it was also for the jury to decide whether, at the point in time when the accident occurred, the modest cost and ready availability of safety glass and the dynamics of the growing custom to use it for shower enclosures had transformed what once may have been considered a reasonably safe part of the apartment into one which, in the light of later developments, no longer could be so regarded.
Furthermore, the charge on this subject was correct. The Trial Judge placed the evidence of custom and usage “by others engaged in the same business” in proper perspective, when, among other things, he told the jury that the issue on which it was received was “the reasonableness of the defendant’s conduct' under all the circumstances”. He also emphasized that the testimony on this score was not conclusive, not only by saying so but by explaining that “the mere fact that another person or landlord may have used a better or safer practice does not establish a standard” and that it was for the jurors “to determine whether *108 or not the evidence in this case does establish a general custom or practice”.
Nevertheless, we reverse and order a new trial because the General Business Law sections should have been excluded. True, if a statutory scheme intended for the protection of a particular class, as is the one here, does not expressly provide for civil liability, there is responsible authority for the proposition that a court may, in furtherance of the statutory purpose, read in such an intent (see Martin v Herzog, 228 NY 164, 168; Restatement, Torts 2d, § 286; see, generally, James, Statutory Standards and Negligence in Accident Cases, 11 La L Rev 95). Be that as it may, the fact is that the statutes here protected only those tenants for whom shower glazing was installed after the statutory effective date. Plaintiff was not in that class. Thus, while new installations made during the three-year interval between July 1,1973, the effective date of the new General Business Law provisions, and July, 1976, when plaintiff was injured, could have counted numerically in the totality of any statistics to support the existence of a developing custom to use safety glass, defendants’ objection to the statutes themselves should have been sustained. Without belaboring the point, it cannot be said that the statutes, once injected into the adversarial conflict, did not prejudice the defendants. Nor is it any answer to suggest that balancing the risk of prejudice against the asserted relevancy of the statutes here was a supportable discretionary judicial act. Unlike hearsay, which at times may be rendered admissible by necessity, the other proof of custom here eliminates the possibility of this justification.
For all these reasons, the order should be reversed and a new trial granted. In so ruling, we see no reason for a retrial of the damages issue. Instead, the new trial will be confined initially to the issue of liability and, if plaintiff once again should succeed in proving that defendants were negligent, to the issue of apportionment of fault between the parties (cf. Ferrer v Harris, 55 NY2d 285).
Accordingly, the case should be remitted to Supreme Court, Bronx County, for further proceedings in accordance with this opinion.
*109 Chief Judge Cooke and Judges Jasen, Gabrielli, Jones, Wachtler and Meyer concur.
Order reversed, with costs, and case remitted to Supreme Court, Bronx County, for a new trial in accordance with the opinion herein.

. The chart had been put in evidence in unredacted form as part of the plaintiff’s medical proof.

. The organizations included the National Safety Council, the American National Standards Institute and the Consumer Safety Commission. One of the governmental publications, issued by the United States Health Department, was entitled Glass Door Injuries and Their Control and another, emanating from the United States Product Safety Commission, was entitled Hazard Analysis — Injuries Involving Architectural Glass.

. Section 389-0 provides “It shall be unlawful within the state of New York to knowingly sell, fabricate, assemble, glaze, install, consent or cause to be installed glazing materials other than safety glazing materials in or for use in, any ‘hazardous locations’.”
“Safety glazing materials” as pertinent here, are defined as “[a]ny glazing material, such as tempered glass, laminated glass, wire glass or rigid plastic, which meets the test requirements of the American National Standards Institute Standard (ANSI Z-97.1 — 1972), and which are so constructed, treated or combined with other materials as to minimize the likelihood of cutting and piercing injuries resulting from human contact with the glazing material”. (§ 398-m, subd [1].)
“Hazardous locations”, as pertinent here, are defined as “those structural elements, glazed or to be glazed in residential buildings and other structures used as dwellings, * * * known as sliding glass doors *** shower doors, bathtub enclosures * * * whether or not the glazing in such doors *** and enclosures is transparent” (§398-m, subd [21).

. Subdivision 1 of section 78 of the Multiple Dwelling Law provides: “Every multiple dwelling * * * and every part thereof * * * shall be kept in good repair. The owner shall be responsible for compliance with the provisions of this section”.