**Orlando BROWN and Mira Brown, Plaintiffs,**

v.

**NATIONAL FOOTBALL LEAGUE, Defendant.**

**No. 01 Civ. 4086(GEL).**

United States District Court, S.D. New York.

March 18, 2002.

Brian J. Shoot (Clifford J. Stern, James M. Lane, The Cochran Firm, Schneider, Kleinick, Weitz, Damashek, & Shoot, New York City, of counsel) for Orlando and Mira Brown.

Brad S. Karp (Jeffrey L. Nagel, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, of counsel) for National Football League.

## OPINION AND ORDER

LYNCH, District Judge.

This is a personal injury action brought by Orlando Brown ("Brown"), formerly a professional football player with the Cleveland Browns, and his wife Mira Brown, against the National Football League ("NFL"), seeking damages for an injury that occurred during a game when an NFL referee threw a penalty flag weighted with "BB" pellets and struck Brown in the eye, causing him to sustain eye injuries that ended his football career. The action was originally brought in New York Supreme Court, Bronx County, and was removed here by the Defendant. As it happens, neither party believes that this Court is the proper forum in which the merits of the dispute should be resolved. Plaintiffs urge that the suit should be remanded to the state courts, to be pursued as an ordinary negligence action; Defendant claims that the case is really one for breach of a collective bargaining agreement ("CBA"), and therefore should be sent to arbitration according to the terms of that agreement.[1]

Following the removal of the action to this Court, the NFL moved to dismiss the complaint, on the ground that the Browns' claims are preempted by Section 301 of the Labor Management Relations Act ("LMRA"); to compel arbitration of Plaintiffs' claims, on the ground that arbitration

---

1. Plaintiffs had filed an earlier complaint against the NFL in Bronx County based on the same injury. (Def.'s Ex. B.) That case was similarly removed to this Court by the NFL, but Brown voluntarily dismissed the complaint shortly after notice of the removal. (Pls.' Ex. 9.) The instant complaint is a slightly modified version of that earlier complaint.

is mandated by the CBA; and to dismiss or stay the claims asserted by Mira Brown, as wholly derivative of her husband's claims. Plaintiffs opposed the motion, and cross-moved pursuant to 28 U.S.C. § 1447(c) to remand the case to the New York state courts. For the reasons that follow, Defendant's motion to dismiss and compel arbitration will be denied, and Plaintiffs' cross motion to remand will be granted.

## BACKGROUND

On December 19, 1999, during the second quarter of a football game in Cleveland in which Brown was playing, NFL referee Jeff Triplette ("Triplette") called a "false start" penalty and released a penalty flag to signal the infraction. Plaintiffs allege that instead of properly dropping the penalty flag in accordance with NFL rules, regulations and guidelines, Triplette negligently threw the weighted penalty flag into the air in Brown's direction. The flag flew through an opening in Brown's protective helmet and struck him the eye. (Comp.¶¶ 30, 31.) The incident caused serious injury to Brown's eye, such that "[h]e can no longer play football without significant risk of sustaining further damage to his eye, including blindness." (Stern Aff., Ex. 2 at 2.) As a result, Brown's previously successful and potentially lucrative career as a professional football player came to an end.

Plaintiffs brought this complaint against the NFL in tort, in four counts. The two claims on Brown's own behalf charge that the NFL is liable for his injuries, both in its own right for negligent hiring and training of Triplette, and vicariously, as Triplette's employer, for his negligence in throwing the flag. Two parallel and derivative claims are brought by Mira Brown,

for loss of services, society, companionship and consortium resulting from her husband's injuries. (Comp.¶¶ 54, 59.) Brown seeks $200 million in damages for loss of future earnings, medical expenses and physical and emotional anguish, and Mira Brown seeks $50 million in damages for her loss of consortium and related claims. (Comp.¶¶ 46, 51, 55, 60.) [2]

More specifically, Brown's first claim is that the NFL breached its duty to him and to the general public to hire and employ competent referees for NFL football games (Comp.¶ 32), to train and supervise its referees (Comp.¶ 33), to ensure that its referees not throw penalty flags directly at a person when calling an infraction (Comp. ¶ 34), to ensure that penalty flags not be unsafely weighted in violation of NFL rules, regulations and guidelines (Comp. ¶ 36) and to train its employees on the proper manner in which penalty flags should be thrown (Comp.¶ 37). Failure of the NFL "to ensure compliance with all NFL rules, regulations and guidelines relative to the type of penalty flag to be used and the manner in which the flag is to be thrown during football games conducted by ... the NFL" is cited by Brown as evidence that the NFL "violated its duty to Brown and the general public." (Comp. ¶ 38.) Brown's second claim is that Triplette was negligent or reckless in throwing the penalty flag that injured Brown (Comp.¶ 49), and that the NFL, as Triplette's employer, was vicariously liable for Triplette's tortious act in question (Comp. ¶ 50).

Thus, Plaintiffs' theory of the case is that this is a garden-variety tort action invoking a general duty to avoid negligently causing harm, owed by the NFL not only to its players but also to any other

---

**2.** Since Mira Brown's claims are derivative of her husband's, they need not be addressed separately at this stage of the case, and the discussion will accordingly focus on Orlando Brown's causes of action.

person in society who could possibly have been threatened by Triplette's weighted projectile. They contend that a fan, member of the press, or other bystander could equally bring such a claim had he or she been injured in the same manner. On this view, whether Triplette or the NFL was negligent, or whether the NFL has a valid defense that Brown assumed the risk of such an injury by playing professional football (or any other defense to the action), are simply ordinary issues of state tort law that, in the absence of diversity of citizenship, should be adjudicated in state court.

For purposes of this motion, the NFL does not dispute the facts in the Browns' complaint. (Def.'s Br. at 4.) Moreover, the NFL agrees that this Court is not the proper forum in which the merits of this dispute should be adjudicated. Defendant, however, views the nature of the case through an entirely different lens. The NFL maintains that this case is really a dispute over the terms of the CBA between the National Football League Players Association ("NFLPA")—the players' union—and the teams comprising the NFL, and, thus, under the terms of the CBA, should be decided in neither state nor federal court, but rather in arbitration pursuant to the terms of the CBA. Because § 301 of the LMRA, 29 U.S.C. § 185(a) (1998), completely preempts state claims to enforce CBAs, the NFL contends that the case was properly removed to federal court, where, in turn, the arbitration clause of the CBA should be enforced.

In support of this claim, the NFL points out that the complaint relies on various documents, such as the NFL's Rules and the NFL Officials Mechanics Manual issued to referees, as evidence of negligence. The NFL argues that these documents are associated with or incorporated by reference into the CBA, and therefore that the references to these documents in the complaint demonstrate that any duty Plaintiffs claim was owed by the NFL to Brown is not a general duty owed to the public at large, but rather is a duty owed to Brown as an NFL player that exists solely because of the CBA. It would thus follow that determining the "precise nature and scope of those duties" necessarily requires interpretation of the CBA. (Def.'s Br. at 3.) Federal jurisdiction would therefore be available. Moreover, the NFL argues, since Brown, as an NFL player, is subject "to the terms of the CBA and its incorporated agreements," and since the CBA specifically states that "any dispute" concerning Brown's employment or the interpretation of the CBA and its related agreements must be sent to arbitration, the Court, after taking jurisdiction, must dismiss the case and order the dispute to be arbitrated. (Def.'s Br. at 2.)

## DISCUSSION

### I. *Preemption and Removal*

■ Complaints originally filed in state court may be removed by a defendant to federal court only if the case could have been filed, in the first instance, in federal court. 28 U.S.C. § 1441(a). Since both Plaintiffs and Defendant are considered, for diversity purposes, citizens of New York, removal here must be based upon the existence of a federal question. Ordinarily, of course, federal jurisdiction exists only where a federal question is presented on the face of a plaintiff's complaint. *Caterpillar, Inc. v. Williams,* 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987). Generally, when a complaint alleges only state law causes of action, it cannot be removed to federal court from state court even if there is a federal defense, thus making the plaintiff "master of the complaint" and allowing a plaintiff to avoid federal jurisdiction by relying exclu-

sively on state law if they so desire. *Id.* at 392–93, 107 S.Ct. 2425.

As with most general rules, however, there is an exception to this so-called "well-pleaded complaint" rule, known as the "complete preemption" doctrine. Under this doctrine, the Supreme Court has held that in certain instances the preemptive force of a statute is "so extraordinary" that it allows a straightforward state law complaint to "properly be removed to the federal courts, even when the plaintiff's complaint does not itself include a federal cause of action" for purposes of the well-pleaded complaint rule. *Foy v. Pratt & Whitney*, 127 F.3d 229, 232–33 (2d Cir. 1997) (citing *Shafii v. British Airways, PLC*, 83 F.3d 566, 569 (2d Cir.1996); *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 253–263, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994); *El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 484 n. 6, 119 S.Ct. 1430, 143 L.Ed.2d 635 (1999)).

■ Section 301 of the LMRA, 29 U.S.C. § 185(a), cited by the NFL as the basis for federal jurisdiction in this case, is the statute most commonly associated with the complete preemption doctrine.[3] It is well established, as Defendant argues, that § 301 completely preempts state law claims, including tort law claims, that involve the interpretation and application of a CBA. *United Steelworkers of Am. v. Rawson*, 495 U.S. 362, 368–69, 110 S.Ct. 1904, 109 L.Ed.2d 362 (1990). Thus, an action that in substance charges a violation of a CBA may be removed to federal court, even though the complaint itself did not include a federal cause of action. *Allis–Chalmers v. Lueck*, 471 U.S. 202, 214, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985). This

must be so, for "[i]f the policies that animate § 301 are to be given their proper range, ... the preemptive effect of § 301 must extend beyond suits alleging contract violations. These policies require that 'the relationships created by [a collective-bargaining] agreement' be defined by application of 'an evolving federal common law grounded in national labor policy.'" *Id.* at 210–11, 105 S.Ct. 1904 (brackets in internal quote in original), quoting *Bowen v. United States Postal Service*, 459 U.S. 212, 225–25, 103 S.Ct. 588, 74 L.Ed.2d 402 (1983).

■ It does not follow, however, that any state tort suit brought by an employee covered by a CBA is preempted by the LMRA. Federal preemption is driven by the need to ensure "that the meaning given a contract phrase or term be subject to uniform federal interpretation. Thus, questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort." *Allis–Chalmers*, 471 U.S. at 211, 105 S.Ct. 1904. Tort claims that do not implicate these federal interests are not preempted. The test is whether the tort claim is "inextricably intertwined with consideration of the terms of the labor contract." *Id.* at 213, 220, 105 S.Ct. 1904. The LMRA does not preempt a claim that merely "relates in some way to a provision in a collective-bargaining agreement." *Id.*

---

**3.** Section 301 provides:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may

be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a) (1998).

As the Second Circuit explained the § 301 standard in *Foy v. Pratt & Whitney:* "[W]here the resolution of a state-law claim depends on an *interpretation* of the collective-bargaining agreement, the claim is pre-empted." *Hawaiian Airlines,* 512 U.S. at 260–62, 114 S.Ct. 2239 (citing *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 405–06, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988)) (emphasis added); *Hernandez v. Conriv Realty Assocs.,* 116 F.3d 35, 38 (2d Cir. 1997). However, "the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." *Livadas v. Bradshaw,* 512 U.S. 107, 124, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994) (citing *Lingle,* 486 U.S. at 413 n. 12, 108 S.Ct. 1877).

127 F.3d at 233. Unsurprisingly, "[t]he boundary between claims requiring 'interpretation' of a CBA and those that merely require such an agreement to be 'consulted' is elusive." *Wynn v. AC Rochester,* 273 F.3d 153, 158 (2d Cir.2001) (following *Foy* ).

Accordingly, to determine whether Brown's claims are pre-empted by federal law, the Court must ask whether the CBA between the team owners and the NFLPA must be interpreted in order to adjudicate Brown's claim of negligence on the part of Triplette in throwing the flag or of the NFL in hiring, training and supervision, or whether Brown's claims rest on an independent state law duty that binds the NFL apart from the CBA.

## II. *The Nature of Plaintiffs' Claims*

### A. *Defining the Duty: Is there an independent state law duty on the NFL?*

Plaintiffs claim that under New York State law, independent of any CBA or other contract, (1) the NFL owes a duty to Brown, as it does to the general public, to use due care in hiring and training its employees to avoid injury to the public, and (2) Triplette owes a duty to Brown, as he does to the general public, to use due care when throwing objects (and the NFL, as his employer, is vicariously liable for any negligent affirmative actions of its employees that fall within the scope of their employment) (Pls.' Br. at 32) The NFL claims that there is no such free-standing duty, but rather that, in order to define the duty they owe to Brown, the Court must necessarily interpret the CBA. Citing *Rawson,* in which the Supreme Court found that a union's duty to inspect mines to assure that they were safe for their workers existed solely because of the CBA and not because of any general tort law duty to conduct inspections in a non-negligent manner, the NFL argues that any duty here arises only by means of the CBA between the NFLPA and the NFL teams. Thus, the NFL asserts that in order to determine what the NFL's duty is and the scope of any such duty, the Court must look to the terms of the CBA and interpret their meaning, which, in turn, means that the dispute is preempted to arbitration for the task of interpretation. (Def.'s Br. at 21.) The NFL further maintains that "[t]he CBA and its related documents also bear directly" on other aspects of the claim, such as Orlando Brown's possible contributory negligence and the damages assessment. *Id.*

■ In determining whether a purported tort claim is merely a restatement of a claim for violation of a CBA, a court must determine if "the duty to the employee of which the tort is a violation is created by a collective-bargaining agreement and without existence independent of the agreement." *Rawson,* 495 U.S. at 362, 110 S.Ct. 1904 (citing *Allis–Chalmers,* 471 U.S. at 211, 105 S.Ct. 1904.) If there is a freestanding state tort duty, the Supreme

Court has repeatedly advised that "it would be inconsistent with congressional intent ... to pre-empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract." *Allis–Chalmers,* 471 U.S. at 211–12, 105 S.Ct. 1904; *Hawaiian Airlines,* 512 U.S. at 260, 114 S.Ct. 2239; *Livadas v. Bradshaw,* 512 U.S. 107, 123–124, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994). To be independent of the CBA, a tort claim must allege a violation of a duty "owed to every person in society," as opposed to a duty owed only to employees covered by the collective bargaining agreement. *Rawson,* 495 U.S. at 362, 110 S.Ct. 1904. In *Rawson,* the Court found the tort claim of negligent inspection not independent of the CBA, as it was not "an act that could be unreasonable irrespective of who committed it and could foreseeably cause injury to any person who might possibly be in the vicinity." *Id.* at 371, 110 S.Ct. 1904. Rather, the claim arose only because the union, which would otherwise have had not duty to inspect the mines, undertook such a duty under the CBA.

■ Defendant's assertion that the NFL owes no common-law duty to ensure that members of the general public will not sustain injuries from being hit by a negligently thrown penalty flag (Def.'s Br. at 18; Def.'s Reply at 15) is unsupported and erroneous. There is unquestionably "substantial authority [in New York] ... that an employer may be liable to a third party for the employer's negligence in hiring or retaining an employee who is incompetent or unfit." *See* N.Y. Jur.2d, Employment Relations § 325 (1996). In these cases, negligence typically consists of "hiring or retaining the employee with knowledge of his [or her] unfitness, or of failing to use reasonable care to discover it before hiring or retaining him [or her]." *Id.* Although Brown's negligence claim is stated somewhat more elaborately in the complaint, he clearly alleges that Triplette was unfit (Comp.¶ 22); that the NFL was negligent in failing to use reasonable care to discover his unfitness (Comp.¶¶ 23–25) and cure it by terminating him or successfully training him (Comp.¶¶ 26–27); and that such negligence was a proximate cause of Brown's injury (Comp.¶¶ 30–31). No contractual relation between the plaintiff and the employer is necessary to such a tort action, a similar cause of action would lie in favor of any member of the public injured by an unfit employee.

■ The theory of respondeat superior is similarly generally applicable when an employee injures a third party while acting within the scope of his or her employment. *See* Restatement (Second) of Agency §§ 243–245 (1958); Restatement (Third) of Torts § 23 (P.F.D. No. 1, 1998), Prosser and Keeton, *Torts* § 70, at 501–2 (5th ed.1984). It is clear that Triplette, as an NFL referee, was acting within the scope of his employment when he threw the penalty flag to signal a rule violation during the course of play. (Pls.' Br. at 33.) It is also clear that Plaintiffs have adequately stated a claim that Triplette was negligent in a manner that would give rise to a cause of action on the part of any member of the general public who might have been injured by his conduct. A special contractual obligation to use due care in throwing small weighted objects, so as to avoid injuring one's fellow citizens, is not necessary for liability. Such a duty of care is a general obligation imposed by tort law on all; it is perfectly foreseeable, as every responsible parent frequently instructs his or her children, that careless throwing of objects poses risks to others, and particularly to their eyes.

Thus, the duties asserted by Plaintiffs are duties owed to the general public, not creatures of contract. *Kwiatkowski v. Bear Stearns & Co.,* 126 F.Supp.2d 672, 694 (S.D.N.Y.2000) (citations omitted).

*See* Prosser § 92 at 655 (tort obligations are "imposed apart from and independent of promises made and therefore apart from any manifested intention of parties to a contract or other bargaining transaction"). And, as stated above, § 301 cannot be read broadly to pre-empt nonnegotiable rights conferred on individual employees as a matter of state law. *Livadas,* 512 U.S. at 123, 114 S.Ct. 2068. In addition, contractual commitments cannot ordinarily serve to shield a defendant from liability for injury caused by a breach of the duty of due care. *See* Restatement (Second) of Torts § 4c. Plaintiffs, therefore, are invoking a free-standing state law tort duty on the NFL, not a duty that only exists because of the CBA.

The Supreme Court's decisions in *Rawson* and *Int'l Brotherhood of Electrical Workers v. Hechler,* 481 U.S. 851, 107 S.Ct. 2161, 95 L.Ed.2d 791 (1987), heavily relied upon by Defendant to support preemption, do not support a different conclusion, and are distinguishable from the instant case in several significant respects. First, defendants in both those cases were not employers, but the plaintiffs' own unions, and the Plaintiffs then claimed that the unions had violated their duties of fair representation to the plaintiffs in their capacities as union members. In *Hechler,* the court was concerned that the respondent's allegations of negligence assumed significance only if "the Union, in fact has assumed the duty of care that the complaint alleges the Union breached." *Id.* at 861, 107 S.Ct. 2161. In *Rawson,* commenting on the finding in *Hechler* that a union may assume a responsibility towards employees by accepting a duty of care through a CBA or other contractual agreement, the Supreme Court found it necessary "to emphasize caution, lest the courts be precipitate in their efforts to find unions contractually bound to employees by collective-bargaining agreements." *Rawson,* 495 U.S. at 374, 110 S.Ct. 1904. The Court warned that "the

doctrine of fair representation is an important check on the arbitrary exercise of union power, but it is a purposefully limited check, for a 'wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents.'" *Id.* (citation omitted).

Here, however, the NFL is a non-union defendant, and Triplette was neither a co-employee of Brown's nor was he employed pursuant to the CBA between the NFL teams and the NFLPA. Thus, the Supreme Court's concern that labor unions be protected from burdensome claims of breach of its duty of fair representation do not apply in this instance. Indeed, in *Hechler,* the Court specifically distinguished between claims against a union and claims against an employer, emphasizing that under Florida common law, relied on by the plaintiff, "it is the *employer,* not a labor union, that owed employees a duty to exercise reasonable care in providing a safe workplace." *Hechler,* 481 U.S. at 859–860, 107 S.Ct. 2161 (citations omitted). The Court in *Hechler* went on to find that under Florida law, the employer "owes a duty to his employees to furnish a reasonably safe place to work, and must use ordinary care and diligence to keep it safe" and that labor unions only accept such a duty of care through a contractual arrangement *Id.* The clear implication is that a tort claim against the employer would not have been preempted in *Hechler,* while the parallel claim against the union was a creature of the CBA.

Further, the decisions in both *Rawson* and *Hechler* relied on the fact that the plaintiffs did not assert rights that were separate from the CBA, but rather alleged "tortious breach-of-contract" claims. *Id.* at 861, 107 S.Ct. 2161. In *Rawson,* the duty of the union to inspect mines was found to exist only because of the contractual duty of care arising from the CBA, and in *Hechler,* plaintiff's allegations were

based on the CBA entered into by the union that created a duty to provide a safe workplace and not allow plaintiff to perform duties beyond her experience. *Rawson,* 495 U.S. at 371, 110 S.Ct. 1904; *Hechler,* 481 U.S. at 853, 107 S.Ct. 2161. *See also Allis–Chalmers,* 471 U.S. at 217, 105 S.Ct. 1904 (finding that the "duties imposed and rights established through the state tort ... derive[d] from the rights and obligations established by the contract"). In neither case did the union owe a duty to non-members, simply as ordinary members of civil society, to protect them from harm by inspecting mines or securing a safe workplace.

In this case, however, the duty asserted by Brown is based on state tort law, and would protect any member of the public. The NFL owes no greater duty to Brown than to any bystander (and Brown does not claim that it does) to train its employees in the safe use of their equipment or to respond in damages if one of its employees in the course of his work carelessly throws something into someone's eye. Although Plaintiffs cite various documents arguably related to the CBA as evidence that Triplette behaved negligently (as will be discussed below), his duty not to negligently throw an object at another individual exists, not because of the CBA entered by the NFLPA, but because the acts alleged could be found to violate state law irrespective of the identity of the tortfeasor or his or her victim. Any such victim could and would cite written instructions issued by the employer as evidence that Triplette had failed to use the care expected of someone in his position. For example, had a fan attending the game been struck by a negligently thrown penalty flag, there is no

question that a cause of action would lie against the referee and the NFL, on exactly the grounds raised by Brown.[4]

Other sorts of tort claims provide examples of non-preempted state law causes of action. Courts of appeals have frequently held that claims of intentional torts like assault or battery brought by employees covered by CBAs against fellow-employees are not preempted by federal labor law. *See, e.g., Hanks v. General Motors Corporation,* 906 F.2d 341 (8th Cir.1990); *Galvez v. Kuhn,* 933 F.2d 773 (9th Cir.1991); *Hayden v. Reickerd,* 957 F.2d 1506 (9th Cir.1991). Thus, if Brown claimed that Triplette had intentionally thrown the flag at him, the resulting battery claim would surely survive any assertion of federal preemption. These cases are of limited value in addressing Brown's claim, however. As the Ninth Circuit held concerning a battery claim, "[w]hatever the parties' rights and duties under their collective bargaining agreement, they could not possibly have negotiated infringement of [plaintiff's] state law right to be free from battery." *Hayden,* 957 F.2d at 1509. There is some merit to the view that workers would be equally unlikely to bargain away their state law right not to be maimed by the negligence of their employers. But this might be too quick a conclusion. While a union would not, and perhaps could not, bargain away its members' right to be free of negligent behavior by its employer or its employers' affiliates, a CBA might well define the nature of the duty of due care owed to employees, or the remedies available to them for breaches of that duty; a union might well waive a right to sue in return for other concessions, or bargain collectively over the standard of

---

4. This is not to say that such an action would ultimately succeed. Whether the referee's actions were negligent would of course have to be determined by a jury, and a number of defenses, including assumption of risk, might be asserted. But the point is that such allegations would clearly present claims under New York state law, that would not have their genesis in any contract between the victim and any component of the NFL.

care required and the dangers or risks assumed by its members.

Thus, while it is clear that Brown's suit is based on an independent state law duty that binds the NFL vis-a-vis all members of society, the Court must still ask whether consideration of Plaintiffs' claims nevertheless will require interpretation of the CBA.

### B. *Interpreting the CBA: Must the CBA be interpreted to adjudicate Brown's claims?*

The NFL argues that Brown's claims ultimately rests on the CBA, because those claims expressly rely, as evidence of negligence, on the assertion that Triplette violated the NFL's "rules, regulations, and guidelines" in weighting his flag with BB pellets and throwing the flag directly at Brown, and that the NFL in turn violated those rules by allowing him to do so. (Comp. ¶¶ 15–17, 19, 20, 25–27, 48–50; Def.'s Br. at 6–7.) Defendant maintains that by invoking these rules, regulations and guidelines as evidence, Plaintiffs are asking the court to interpret the CBA, because the CBA incorporates by reference an extended chain of separate documents as follows the NFL Constitution which incorporates the NFL Rules, which incorporate the NFL Officials Mechanics Manual, which incorporates the Guidelines for Conduct of NFL Game Officials. (Def.'s Br. at 9–11.) Thus, the NFL argues that when Plaintiffs look to any of these documents to establish evidence of a duty of care and/or departure from that duty, the claim is preempted under § 301, as it is inextricably intertwined with the terms of a labor contract.

Plaintiffs respond to this argument on two levels. First, they argue that they "do not claim any rights different or superior to those of a non-employee who might have been struck by Triplette's weighted flag," but simply that, to determine negligence, state tort law looks to whether a defendant violated its own rules or standards. (Pls.' Br. at 34.) Second, they argue that the rules that they reference are, in any event, not part of the CBA. (Pls.' Reply at 4–5.)

#### 1. *Do the Documents Relied on by Plaintiffs Define or Merely Evidence a Duty?*

Plaintiffs first argument has considerable plausibility. The heart of the NFL's preemption claim is that Brown's purported tort suit is really a disguised suit for breach of the CBA. On the very surface, this claim is dubious, because the NFL is neither Brown's employer nor a party to the CBA. At the time of his injury, Brown worked not for the NFL, but for the Cleveland Browns Football Company, a Delaware limited partnership and an entirely separate entity which happens to be a member of the NFL. (Pls.' Ex. 3 at 1.) The NFL is an unincorporated non-profit membership organization composed of the different corporations owning professional football teams. *See National Football League v. Ellicottville Gin Mill, Inc.*, 1995 WL 737935 (W.D.N.Y.1995) at 1. The NFLPA, the union that negotiated the CBA, bargains with the NFL Management Council, the exclusive bargaining representative of the NFL team owners, which represents the separate corporations that own franchises in the NFL and employ the union members as football players. As outlined in the CBA, Article II § 3, the NFL member clubs maintain the right "to manage and direct their operations in any manner whatsoever, except as specifically limited" by the provisions of the CBA. (Pls.' Ex. 4 at 9.) Triplette, on the other hand, *is* employed by the NFL, and is neither a co-employee of Brown nor a member of the same bargaining unit nor a party to the CBA. Given these circumstances, this is clearly not a typical suit by an employee against an employer that, though perhaps couched in tort terminology, sounds ultimately in violation of a duty

created by a contract between the employer and its employees.

Plaintiffs are correct, moreover, that their use of the NFL Rules and the NFL Officials Mechanics Manual does not correspond to the use made of a contract by a plaintiff suing for its breach. In such a case, the plaintiff references the contract as the source of the duty—a use that no stranger to the contract, save for a specially intended third-party beneficiary, can make. For example, if a retailer's supplier of goods fails to perform as required by contract, that retailer can sue him, but an individual consumer typically cannot, because the obligation to deliver goods was created by an agreement between the retailer and the supplier; the supplier has no similar obligation running to the general public.

 In this case, however, a hypothetical spectator or photographer similarly injured by Triplette's flag would be permitted, under New York law, not only to make the same claim that Brown makes, but to make the same use of the documents to which Brown refers. A plaintiff arguing that a member of a particular trade or profession behaved negligently in carrying out his duties may appropriately use as evidence of negligence manuals, regulations, or other materials defining the reasonable and expected standards of professional practice within that occupation. *See, e.g., Mishkin v. Peat, Marwick, Mitchell & Co.* 744 F.Supp. 531, 537 (S.D.N.Y.1990) (deviation from standards or guidelines may be some evidence of negligence); *Trimarco v. Klein,* 56 N.Y.2d 98, 105–6, 451 N.Y.S.2d 52, 436 N.E.2d 502 (1982) (proof that a customary practice was ignored and that this departure was proximate cause of accident can establish liability); *Danbois v. New York Central R.R. Co.,* 12 N.Y.2d 234, 329–240, 238 N.Y.S.2d 921, 189 N.E.2d 468 (1963) (railroad's internal operating rules to be considered by the jury as evidence that reasonable care not taken). Thus, not only does Plaintiffs' lawsuit invoke the generally-applicable tort-law duties of reasonable care owed by the NFL and Triplette to the general public under New York law, but their citation of evidence drawn from the NFL Rules and other regulations to demonstrate how the referee allegedly should have acted is also a use that any member of the public could have made.

At the same time, it cannot be said that the duties owed by the NFL to Brown are necessarily entirely independent of the CBA. Among the obvious defenses that the NFL would raise on the merits of this action, or of a hypothetical parallel action by a spectator, would be assumption of risk. Assumption of risk, however, is a complex doctrine that functions in different ways in different circumstances. As the New York Court of Appeals has pointed out, New York law distinguishes between two different types of assumption of risk:

> Express assumption, which was held to preclude any recovery, resulted from agreement in advance that defendant need not use reasonable care for the benefit of plaintiff and would not be liable for the consequence of conduct that would otherwise be negligent. [Citations omitted.] Implied assumption was founded not on express contract, but on plaintiff's voluntarily encountering the risk of harm from defendant's conduct with full understanding of the possible harm to himself or herself [citations omitted], and according to some authorities required that plaintiff's consent to the risk involved be unreasonable under the circumstances.

*Arbegast v. Bd. of Educ. of S. New Berlin Cent. Sch.,* 65 N.Y.2d 161, 169, 490 N.Y.S.2d 751, 480 N.E.2d 365 (1985).[5]

---

5. The distinction has considerable significance in New York law, since under current

Yet another line of New York cases, moreover, holds (under the rubric of "primary" assumption of risk) that participants in athletic events assume the normal risks of playing in their respective sports. *See, e.g., Morgan v. State of New York,* 90 N.Y.2d 471, 662 N.Y.S.2d 421, 685 N.E.2d 202 (1997) (bobsledding), *Turcotte v. Fell,* 68 N.Y.2d 432, 438, 510 N.Y.S.2d 49, 502 N.E.2d 964 (1986) (horse racing), *Maddox v. City of New York,* 66 N.Y.2d 270, 496 N.Y.S.2d 726, 487 N.E.2d 553 (1985) (baseball). In these cases, the Court of Appeals has asserted that the doctrine in question is not really a separate defense at all, but a question that "serves to define the standard of care under which a defendant's duty is defined and circumscribed 'because assumption of risk in this form is really a *principle of no duty,* or no negligence and so *denies the existence of any underlying cause of action.*'" *Morgan,* 90 N.Y.2d at 485, 662 N.Y.S.2d 421, 685 N.E.2d 202 (quoting Prosser and Keeton, *Torts* § 68, at 496–97 (5th ed.1984) (emphasis added by Court of Appeals)).

In light of these principles, it would appear that the duty owed by the NFL (or by other participants in football exhibitions such as players, referees, stadium owners, and so on) to players such as Brown is not quite the same as that owed to spectators, journalists granted access to the playing field, or persons walking past the stadium. The latter groups are owed a general duty of reasonable care, limited only by the possibility that they may impliedly (to the extent that one going past the stadium, into the seats, or onto the field voluntarily and with full understanding accepts certain dangers) or expressly (to the extent their ticket of admission or press credentials might embody a contract by which they agree to accept responsibility for any injury) assume certain risks. But for the football player, it is arguable that under New York law the NFL's duty simply does not extend to the avoidance of any risk that is inherent in playing the game. From this perspective, in the case of athletic events, documents that define how the game is to be played might function not merely as evidence of the appropriate standard of care, but as part of the very definition of a specially-defined duty owed by one participant to another.

Moreover, under such circumstances even an action clearly sounding in general concepts of tort may implicate contractual relationships among the participants. It is perfectly conceivable that a union of football players could bargain for a CBA that defines the nature of the risks they are assuming. Accordingly, it is necessary to examine the documents in question more closely to determine whether the CBA defines the NFL's duties to Brown after all.

### 2. Are the Documents Relied on by Plaintiffs Part of the CBA?

Answering this question thus will require a review of the CBA. But as the Second Circuit has made clear, "the review of the CBA needed to decide preemption in this case is not in itself 'interpretation' warranting preemption; if it were, the preemption doctrine under § 301 would swallow the rule that employees can assert nonnegotiable state law rights that are independent of their collective bargaining agreements." *Foy,* 127 F.3d at 234.

As stated above, Plaintiffs point out that their complaint makes no reference to the CBA. Rather the documents it cites as evidencing the proper standard of careful

law, implied assumption of risk is no longer a complete defense, but is subsumed under New York's comparative fault statute, while express assumption of risk continues to be a complete defense. *Arbegast,* 65 N.Y.2d at 169–70, 490 N.Y.S.2d 751, 480 N.E.2d 365; *Wheeler v. Couret,* 182 F.Supp.2d 330, 336–7 (S.D.N.Y.2001).

referee behavior are "the NFL rules, regulations and guidelines." (Comp.¶¶ 19, 26, 27, 35–38.) The NFL argues, however, that those documents are effectively incorporated by reference into the CBA. (Defs.' Br. at 11.) The Court disagrees.

To begin with, nothing in the CBA proper purports to define the risks normally attendant on playing football, or to define the nature of the game itself. Indeed, "the NFL Rules are not mentioned in the CBA." (Pls.' Reply Br. at 4.) Defendant, however, claims that the CBA incorporates the NFL Constitution, the NFL Rules, the NFL Officials Mechanics Manual and the Guidelines for Conduct of NFL Game Officials. It is by reference to these documents, Defendant maintains, that the nature of the game, and thus the limits of any duty owed to the players, must be determined.

■■■■ The NFL Constitution, Defendant claims, is incorporated by Article III § 1 of the CBA, which states that "the NFLPA and the Management Council will waive all rights to bargain with one another concerning any subject ... for the duration of this Agreement, including the provisions of the NFL Constitution and Bylaws." While this provision does indicate that the Constitution was bargained over and included within the scope of the CBA, nothing in the Plaintiffs' complaint requires interpretation of the terms of the NFL Constitution. Defendant claims that NFL Constitution §§ 8.5 and 8.7 are "directly relevant" to Brown's claims. These sections provide that the NFL Commissioner is to "interpret and ... establish policy and procedure in respect to the provisions of the Constitution and Bylaws and any enforcement thereof" (§ 8.5) and that the Commissioner shall select a "Supervisor of League Game Officials and shall further select all game officials for all ... games" (§ 8.7). These provisions, however, have nothing to do with Brown's

claims, which are not brought against the NFL Commissioner and do not rely on any provisions defining the Commissioner's responsibilities. The fact that there are referees, and that they work for the NFL, can be established independent of these sections. In any event, determining whether Triplette or the NFL was negligent will require no interpretation of these provisions by the state court. *See Wynn*, 273 F.3d at 159 (no preemption when no relevant dispute about the meaning of the CBA).

The NFL goes on to argue, however, that if the Constitution is incorporated into the CBA, then so are the NFL Rules. According to the NFL, § 11.1 of the NFL Constitution incorporates the NFL Rules into the Constitution (and thus into the CBA). (Defs.' Br. at 10.) But § 11.1 does not explicitly or implicitly incorporate the NFL Rules as part of the Constitution, any more than references in the United States Constitution to laws made by Congress make those laws part of the Constitution itself. Section 11.1 merely states: "The playing rules of the League shall be those set out in the National Football League Rules Book." (Pls.' Ex. 5 at 46.) This provision tells us where to look to find the rules, but it does not provide that the rules are part of the Constitution. If it did, then the NFL Rules, like the Constitution, could not be changed during the life of the CBA, or without bargaining with the union. But this does not appear to be the case.

Article XIII § 1(c) of the CBA suggests that while the *process* of rulemaking has been bargained over and incorporated in the CBA, the content of the NFL Rules has not been made part of the CBA. (Pls.' Ex. 4 at 35–36.) That provision allows for the player's union to call a meeting of a Joint Committee on Player Safety and Welfare to discuss proposed rule changes,

and request an advisory decision by a designated arbitrator. Ultimately, however, the players' views on a particular rule cannot determine whether or not a rule is changed or adopted. ("Except as so limited, nothing in this section will impair or limit in any way the right of the Clubs to make any playing rule changes whatsoever." *Id.*) Although the process of commenting on rule changes is clearly a subject that was bargained over, this does not mean that the content of the rules themselves is incorporated into the CBA. Given the conspicuous absence from the text of the CBA of language incorporating the NFL Rules, particularly when there are provisions relating to dispute resolution that do explicitly incorporate the Constitution and Bylaws, such as the Article IV no-suit clause and the Article IX non-injury grievance provision, the NFL Rules cannot be said to be incorporated by reference into the CBA.[6]

It follows *a fortiori* that neither the NFL Officials Mechanics Manual nor the Guidelines for Conduct of NFL Game Officials are part of the CBA. Unsurprisingly, the CBA, which governs the relations between the players and the teams that employ them, makes no explicit reference whatsoever to the duties or terms of employment of referees, who are separately employed by the NFL. Defendant claims that the NFL Rules are the connecting link between the CBA and the Officials Manuals. But if the NFL Rules themselves are not incorporated into the CBA,

then the Officials' Manual and Guidelines cannot (assuming arguendo they are somehow incorporated by reference into the rules—itself a dubious proposition) be considered as part of the CBA. And this makes perfect sense: it would be difficult to imagine that the NFL would be prohibited from altering any particular minute detail of its instructions to its referee-employees without having to bargain over those details with union representatives, not of the referees, but of the players.

Accordingly, even if the references in Plaintiffs' complaint to the content of specific NFL Rules, or to the various instruction manuals for referees, are seen not merely as evidence of professional standards, but as sources that define the ordinary nature and risks of football and thus define the duties of care owed to Plaintiffs, these documents are not part of the CBA. As the CBA incorporates by reference (at most) only the NFL Constitution and its Bylaws, and the terms of the Constitution and Bylaws need not be interpreted in adjudicating Plaintiffs' claims, there is no need to interpret any terms of the CBA in order to adjudicate Plaintiffs' claims. In the absence of a showing that Plaintiffs' claim for breach is "inextricably intertwined with consideration of the terms" of the CBA, the claims are not preempted by § 301 of the LMRA and Plaintiffs must be permitted to pursue their state law tort claims.

---

**6.** This matter is commented on in letters submitted by the NFLPA and the NFL Management Council as *amici curiae*. Somewhat paradoxically, the union (supporting Plaintiffs' position) minimizes its own power to bargain over the rules. It points out that if the NFL Rules were incorporated into the CBA by reference, that would imply that the rules were subject to bargaining with the Union, but the NFLPA asserts that it in fact has no authority to veto any changes in playing rules that the NFL may decide to adopt. *See*

Letter from Richard Berthelsen to the Court of 12/12/01. The Management Council, supporting the NFL, points out, among other things, that Article XIII of the CBA delineates detailed procedures for comment and input on playing rules and safety by the NFLPA. *See* Letter from Dennis Curran to the Court of 12/20/01. It does not dispute, however, that the NFL Rules, unlike the CBA, may be changed during the life of the CBA without the union's approval.

### III. *Non–Suit and Arbitration Provisions*

The Second Circuit has repeatedly reminded us that " § 301 preemption applies only when necessary 'to assure that the purposes animating § 301 will be frustrated neither by state laws purporting to determine questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, nor by parties' efforts to renege on their arbitration promises by relabeling as tort suits actions simply alleging breaches of duties assumed in collective-bargaining agreements." ' *Foy,* 127 F.3d at 234 (quoting *Livadas,* 512 U.S. at 122–23, 114 S.Ct. 2068). *See also Wynn,* 273 F.3d at 158 (same).

As demonstrated above, this case does not raise the specter of state law purporting to interpret what the parties to the CBA agreed to, or to attach any legal consequences to breach of the CBA. But the NFL does attempt to argue that Article IV § 2 of the CBA expressly forbids Brown from filing this lawsuit (Def.'s Reply Br. at 19), and that the parties have agreed to arbitrate disputes such as this. (Def.'s Br. at 24, Def.'s Reply at 19–20.) The parties appear to agree, however, that a promise in the CBA not to sue on a state-law tort claim would not confer federal jurisdiction, and that the remedy for the NFL if a player sued in violation of such a pledge would be a motion in state court to dismiss on the basis of the "no suit" clause. (11/16/01 Tr. at 34.) This approach would create precisely the prospect that the Supreme Court has cautioned against, by permitting diverse state court interpretations of no suit and arbitration clauses in CBAs. Accordingly, the Court, in an excess of caution, will assess the possibility that these clauses prohibit the instant action, and that such provisions themselves could justify federal jurisdiction, at least to the extent necessary to interpret and enforce them.

The no suit provision of the CBA, Article IV § 2, states in relevant part:

> .The NFLPA agrees that neither it not any of its members .. will sue ... the NFL ... with respect to any claim relating to any conduct permitted by this Agreement [or] the Settlement Agreement [or] relating to the presently existing provisions of the Constitution and Bylaws of the NFL as they are currently operative and administered . . . .

(Def.'s Ex. 4 at 11.) Plaintiffs argue, with the *amicus* support of the NFLPA, that this provision (as is suggested by the reference to the Settlement Agreement, and by a list—elided in the quotation above—of specific practices included in the no suit clause) is only intended to preclude antitrust suits concerning such practices as the college draft, free agency rules, and the salary cap. (11/16/01 Tr. at 45–46; Letter from Berthelsen to the Court of 12/12/01, referencing Letter from Berthelsen to Goldfein of 5/6/93.)

The Court need not go so far to resolve this issue, however. Giving the no-suit clause the broadest literal sweep of the language quoted above, we can assume arguendo that the clause is intended to prohibit *any* suit by a player against the NFL for *any* conduct "permitted by [the CBA]," or for *any* suit relating to the "Constitution and Bylaws of the NFL." As already discussed, nothing in the CBA remotely purports to address the use of penalty flags, let alone to provide that negligently throwing penalty flags is conduct "permitted by [the CBA]." As demonstrated above, while the issues in this case could involve the NFL Rules, which include a provision relating to the use of penalty flags, or the various Officials' Manuals, nothing in the suit turns on the interpretation or enforcement of, or in any way

relates to, the Constitution and Bylaws, which relate to the organization of the league and not to the rules of play. Thus, by its own terms, the no-suit provision has nothing to do with this lawsuit, and could not serve as a basis for removal of the suit to federal court.

 The arbitration clause cited by the NFL provides no greater help to its position. The CBA does not contain a single all-encompassing arbitration provision, but rather several different arbitration provisions relating to different types of grievances. The arbitration clause relied on by the NFL is Article IX, entitled "Non–Injury Grievance." [7] But this provision applies only to grievances "involving the interpretation of, application of, or compliance with, any provision of this Agreement, the NFL Player Contract, or any applicable provision of the NFL Constitution and Bylaws pertaining to terms and conditions of employment of NFL players." The cited arbitration clause, thus, only applies to disputes growing out of the CBA itself, the NFL Player Contract,[8] or the Constitution and Bylaws. It does not purport to require arbitration of what would otherwise be tort actions brought by players against the NFL for the carelessness of its employees.

However broad their coverage with respect to disputes arising under the CBA—a matter this Court has no occasion to address—neither the no-suit clause nor the "non-injury grievance" arbitration provision purports to have any application to disputes between players and the NFL other than claims for breach of the CBA and the provisions of the NFL Constitution and Bylaws specifically incorporated therein. The Court thus need not address whether a clause that did prohibit ordinary tort suits would provide federal jurisdiction under § 301. For purposes of this case, those clauses simply refer us back to the same inquiry with which we began: whether the Plaintiffs' suit is a cleverly-pleaded suit to enforce the CBA, or rests on state law duties to the general public that exist independently of the CBA. Since the action will not require interpretation of the CBA, but will instead implicate only ordinary concepts of negligence and assumption of risk, referring at most to the playing rules of NFL football and the proper conduct of referees—none of which are addressed in the CBA—"the purposes behind § 301 will in no way be thwarted by allowing Plaintiffs to go forward with their state law claims in state court." *Foy*, 127 F.3d at 234.

Nothing in this opinion is intended to address in any way the merits of Plaintiffs' state-law tort claims. Whether the risk of injury from a referee's thrown flag is one that is intrinsic to football and assumed by any player in the NFL, whether referee Triplette departed in any way from the recommended practice or from ordinary care in his actions, whether the damage to Brown's health and livelihood was the culpable fault of the NFL or its employees or simply a tragic accident, are not for this Court to decide. All that this Court decides is that the answers to these ques-

---

**7.** One might wonder how this claim of negligent injury could be covered by an arbitration provision dealing with "Non–Injury" grievances. However, an "Injury Grievance" is a specific kind of claim, which is defined and referred to a different arbitration mechanism in Article X of the CBA. (Def.'s Ex. D at 25.) The NFL concedes that Plaintiffs' claim is not an "injury grievance" within the meaning of this provision.

**8.** The "NFL Player Contract" is the contract of employment between a player and an individual football team. Such contracts are defined and provided for in the CBA. As specified by Article XIV § 1 of the CBA, the NFL Player Contract form is used for all player signings and cannot be amended without the approval of the NFL Management Council and the NFLPA. (Def.'s Ex. D at 37.)

tions are matters of ordinary state law, and not questions of the interpretation of the collective bargaining agreement between the players and the NFL teams.

## CONCLUSION

Having carefully considered all the NFL's arguments, the Court concludes that this lawsuit is not an action for breach of the collective bargaining agreement, or one that calls into question the meaning of any of the terms of the agreement between the players and their employers. Defendant's motion to dismiss and compel arbitration, and to stay or dismiss Mira Brown's claims pending arbitration, is therefore denied. Plaintiffs' cross-motion to remand to state court is granted.

SO ORDERED.